## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Hazelden Betty Ford Foundation, a Minnesota nonprofit corporation, and | Case No. 20-cv-409 (JRT/TNL) |
| Elizabeth B. Ford Charitable Trust, | **\*FILED UNDER SEAL\***[1] |
| Plaintiffs, | |
| v. | **ORDER** |
| My Way Betty Ford Klinik GmbH, | |
| Defendant. | |

Laura L. Myers, Luke P. de Leon, and Timothy M. O'Shea, Fredrikson & Byron, PA, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425 (for Plaintiffs); and

Chad A. Snyder and Michael H. Frasier, Rubric Legal LLC, 111 Third Avenue South, Suite 110, Minneapolis, MN 55401; and Jiwon Juliana Yhee, Michael S. Golenson, and Riebana Elisabeth Sachs, Masuda, Funai, Eifert & Mitchell, Ltd., 203 North LaSalle Street, Suite 2500, Chicago, IL 60601 (for Defendant).

## I. INTRODUCTION

This matter comes before the Court on Defendant My Way Betty Ford Klinik GmbH's ("Klinik") Motion to Compel, ECF No. 100, and Plaintiffs Hazelden Betty Ford Foundation and Elizabeth B. Ford Charitable Trust's (collectively, "Hazelden Betty Ford") Motion to Compel Further Answers, Production of Documents, and Deposition

---

[1] A number of documents were filed under seal in connection with these motions. The hearing was held in open court. *See generally* ECF No. 143. In this Court's view, there is no need to seal this order. The Court has, however, done so out of an abundance of caution in order to give the parties an opportunity to weigh in on whether there is a need for sealing. Accordingly, within 14 days from the date of this Order, the parties shall have met and conferred and filed a joint letter on the docket, specifying which, if any, portions of this Order should remain sealed and the basis therefor.

Appearances in the United States, ECF No. 106.

A hearing was held.  ECF No. 143.  Laura L. Myers and Timothy M. O'Shea appeared on behalf of Hazelden Betty Ford.  Alan M. Anderson, of the Alan Anderson Law Firm LLC,[2] appeared on behalf of the Klinik.

## II. BACKGROUND

Hazelden Betty Ford "operate[s] drug and alcohol treatment programs across the United States and hold[s] exclusive rights to the use and licensing of the Betty Ford Marks, which are associated with [its] distinct treatment model." *Hazelden Betty Ford Found. v. My Way Betty Ford Klinik, GmbH*, No. 20-cv-409 (JRT/TNL), 2021 WL 3711055, at *1 (D. Minn. Aug. 20, 2021) [hereinafter *Hazelden II*]; *see also Hazelden Betty Ford Found. v. My Way Betty Ford Klinik, GmbH*, 504 F. Supp. 3d 966, 970-91 (D. Minn. 2020) [hereinafter *Hazelden I*].  The Klinik "is a German entity that operates a drug and alcohol treatment facility in Bad Brückenau, Germany."  *Hazelden II*, 2021 WL 3711055, at *1; *see also Hazelden I*, 504 F. Supp. 3d at 971.

In brief, "[f]rom 1992 to 2013, the Betty Ford Center . . . , a former California nonprofit public benefit corporation, held a limited license from the Betty Ford Trust permitting [the Betty Ford Center] to use the Betty Ford name and Marks in connection with its substance abuse treatment services."  *Hazelden I*, 504 F. Supp. 3d at 971.  "In 2012, [the Klinik] contacted [the Betty Ford Center] to explore the possibility of a cooperative relationship."  *Id.*; *see also Hazelden II*, 2021 WL 3711055, at *1.  In 2013, Sigurd Gawinski and Sven Marquardt "traveled to California on behalf of . . . [the] Klinik

---

[2] *See* ECF No. 166 (notice of withdrawal and substitution of counsel).

to discuss their ideas and deliver a letter of intent for the proposed partnership." *Hazelden I*, 504 F. Supp. 3d at 971-72. The Betty Ford Center subsequently informed the "Klinik that [it] was not interested in pursuing a business arrangement." *Id.* at 971.

In the fall of 2013, "[the Betty Ford Center] merged with Hazelden, a Minnesota nonprofit corporation with a principal place of business in Center City, Minnesota," which "operates alcohol and drug treatment programs in Minnesota, California, Oregon, Illinois, Florida, Washington, and New York." *Id.* at 971, 972. "While the Betty Ford Trust continues to own the 'Betty Ford Center' trademark for uses related to education, treatment, and other drug and alcohol treatment services, Hazelden has the exclusive right to use the Betty Ford Name and Marks." *Id.* at 971.

In April 2014, "Marquardt and Gawinski traveled to Minnesota and met with" Hazelden. *Id.* at 972; *see also Hazelden II*, 2021 WL 3711055, at *1. "Hazelden informed . . . [the] Klinik in writing at that meeting that it would not provide a license to use the Betty Ford name and that it relied on . . . [the] Klinik's prior assurances that it would change its name and cease using references to 'Betty Ford' by July 1, 2015." *Hazelden II*, 2021 WL 3711055, at *1; *see also Hazelden I*, 504 F. Supp. 3d at 972. The Klinik has "continued to use the 'Betty Ford' name." *Hazelden I*, 504 F. Supp. 3d at 972; *see also Hazelden II*, 2021 WL 3711055, at *2.

By Amended Complaint, Hazelden Betty Ford brings claims against the Klinik for trademark infringement under 15 U.S.C. § 1114; unfair competition under 15 U.S.C. § 1125(a); false advertising under 15 U.S.C. § 1125(b); common-law trademark infringement; cybersquatting in violation of 15 U.S.C. § 1125(d); and right of publicity

infringement under Cal. Civ. Code § 3344.1.  *See generally* ECF No. 6.

### III. ANALYSIS

#### A. Legal Standard

The parties' motions implicate the Court's broad discretion in handling pretrial procedure and discovery.  *See, e.g.*, *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 353 (8th Cir. 2020) ("A district court has very wide discretion in handling pretrial discovery . . . ." (quotation omitted)); *Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-2637 (SRN/BRT), 2016 WL 7377099, at \*2 (D. Minn. Dec. 20, 2016) ("Further, magistrate judges 'are afforded wide discretion in handling discovery matters and are free to use and control pretrial procedure in furtherance of the orderly administration of justice.'" (internal quotation marks omitted) (quoting *Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2013 WL 6511851, at \*3 n.3 (D. Minn. Dec. 12, 2013)).

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  "Some threshold showing of relevance must be made[, however,] before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case."  *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).  Further, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes."  *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment); *see Lynch v. Experian Info. Sols., Inc.*, 569 F. Supp. 3d 959, 963 (D.

4

Minn. 2021) ("Beyond being relevant, Rule 26 requires that information sought in discovery also be 'proportional to the needs of the case.'" (quoting Fed. R. Civ. P. 26(b)(1))), *aff'd*, 581 F. Supp. 3d 1122 (D. Minn. 2022). "[A] court can—and must— limit proposed discovery that it determines is not proportional to the needs of the case." *Vallejo*, 903 F.3d at 742 (quotation omitted); *see* Fed. R. Civ. P. 26(b)(2)(C)(iii). Considerations bearing on proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Vallejo*, 903 F.3d at 742-43.

"Trademarks are protected against infringement, that is, the use of similar marks on similar or related products or services if such use creates a likelihood of confusion." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 932 (8th Cir.), *cert. denied sub nom. Dires, LLC v. Select Comfort Corp.*, 142 S. Ct. 561 (2021). "The 'core inquiry' when assessing the likelihood of confusion is 'whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an affiliation between sources based on a defendant's use.'" *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 947 (8th Cir. 2023) (quoting *Select Comfort Corp.*, 996 F.3d at 933). The Eighth Circuit Court of Appeals

> has set forth a list of nonexclusive, nonexhaustive factors to assess likelihood of confusion, which includes: (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged

> infringer's intent to "pass off" its goods as those of the
> trademark owner; (5) incidents of actual confusion; and (6)
> the type of product, its cost and conditions of purchase.

*Id.* (quotation omitted); *accord Select Comfort Corp.*, 996 F.3d at 933; *see also SquirtCo.*

*v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  "[N]o one factor is controlling

and different factors will carry more weight in different settings." *Select Comfort Corp.*,

996 F.3d at 933; *accord H&R Block*, 58 F.4th at 947.  Moreover, "depending on the

context, a strong showing as to one factor may serve to make a different factor more or

less important." *Select Comfort Corp.*, 996 F.3d at 934.  As the Eighth Circuit has

explained,

> [t]his flexible, context-specific, and relative-rather-than-
> mechanical approach makes sense because the general
> function of the likelihood-of-confusion factors is to guide the
> finder of fact towards considerations generally thought to be
> material to the consuming public's understanding of product
> source or affiliation.  Common sense is inherent in the
> factors, and the factors, properly applied, should try to
> capture a holistic view of the normal experiences for any
> given industry, product, or service.  The consumer experience
> differs by products (buying a toothbrush vs. buying a car vs.
> professional buyers obtaining input goods for a factory), and
> the relative importance of any given factor is influenced
> greatly by how the other factors might apply.

*Id.*

### B.  The Klinik's Motion

The Klinik moves to compel responses to Request for Production Nos. 6, 7, and

14.  The Court considers each in turn.

#### 1.  Request for Production No. 6

Request for Production No. 6 seeks "[d]ocuments showing or relating to any

planned or future development of any goods or services in the U.S. or globally in connection with the Asserted Marks or any other marks that include the term 'Betty Ford.'" Def.'s Mem. in Supp. at 7 (quotation omitted), ECF No. 103.

The Klinik asserts this request seeks relevant information related to the degree to which the parties compete with one another and the broad injunctive relief sought by Hazelden Betty Ford. Pointing to a 2021 letter Hazelden Betty Ford sent to the Center for Protection Against Unfair Competition in Germany, the Klinik asserts that, "[a]lthough Hazelden [Betty Ford] has admitted that it 'does not work directly in Germany,' it has hedged that admission by also asserting that it treats patients from Germany and is 'at least not currently' 'actively working in Germany.'" Def.'s Mem. in Supp. at 12 (quoting Ex. B at 6, 8[3] to Decl. of Alan M. Anderson, ECF No. 104-2).

Hazelden Betty Ford counters that "it is undisputed that the parties are currently using their respective BETTY FORD marks in connection with identical services," Pls.' Mem. in Opp'n at 12, ECF No. 123, and that "it is undisputed that Hazelden Betty Ford is not currently operating in Germany," Pls.' Mem. in Opp'n at 13. Hazelden Betty Ford further counters that "[a]ny future or planned use" of the marks it may have is irrelevant. Pls.' Mem. in Opp'n at 12-13. In addition, Hazelden Betty Ford points to responses it gave to interrogatories asking it to "[i]dentify all physical locations where [it] do[es] business" and to "[d]escribe any plans to expand . . . [its] operations . . . beyond its current locations to any locations elsewhere in the world, including any plans to provide virtual services in the U.S. or globally." Pls.' Mem. in Opp'n at 14 (quotation omitted).

---

[3] For citation uniformity, the Court uses the pagination generated by the Court's electronic filing system.

Hazelden Betty Ford contends that this should be sufficient.

Hazelden Betty Ford points to *Southgate v. Soundspark, Inc.* for the proposition that trademark infringement focuses on "current, not future or past, use of a mark." No. 14-cv-13861-ADB, 2016 WL 1268253, at *3 (D. Mass. Mar. 31, 2016). *Southgate* found that the plaintiff failed to state a claim for trademark infringement of a particular mark because the plaintiff had only "mentioned his plan" for use of the mark, but had "not allege[d] any actual use of . . . [the] mark." *Id.* The *Southgate* court explained that "[t]o allege a valid trademark infringement claim, a plaintiff must allege current, not future or past use of a mark." *Id.* Because the plaintiff had "not alleged any actual use of . . . [the] mark," his claim for trademark infringement failed. *Id.* The Court does not find *Southgate* to be particularly persuasive in addressing more nuanced questions about the potential scope of requested injunctive relief with respect to marks that are undisputedly in use and, per Hazelden Betty Ford's own discovery responses, in use "beyond its current physical locations and across the world." Pls.' Mem. in Opp'n at 14 (quotation omitted) (answer to Interrogatory No. 12).

The Court agrees that documents showing or relating to Hazelden Betty Ford's planned or future development is relevant to the Klinik's defense to Hazelden Betty Ford's requested injunctive relief. *See Colgate-Palmolive Co. v. Johnson & Johnson*, No. 09 Civ. 6787 (SHS) (DF), 2010 WL 11655491, at *3 (S.D. N.Y. Dec. 1, 2010). In its current form, however, the Court concludes Request for Production No. 6 is overly broad in its geographic scope and not proportional to the needs of this case. The Court finds that narrowing the scope of Request for Production No. 6 to documents relating to

8

Hazelden Betty Ford's planned or future development in Germany is more appropriately tailored to the needs of this case. Therefore, the Klinik's motion is granted in part with respect to the requested documents relating to any planned or future development in Germany, and is otherwise denied.

### 2. Request for Production No. 7

Request for Production No. 7 seeks "[a]ll documents that refer or relate to [the Klinik], or concerning the Ford Trust's or Hazelden's knowledge of [the Klinik] or [the Klinik's] Marks, including, but not limited to, all Documents reflecting Communications about [the Klinik] or [the Klinik's] use of [the Klinik's] Marks." Def.'s Mem. in Supp. at 8. As confirmed at the hearing, the present dispute specifically concerns production of Hazelden Betty Ford's patient files. Tr. 7:11-16, 15:11-16, 16:12-20:25, ECF No. 149.

### a. Meet and Confer

As an initial matter, Hazelden Betty Ford asserts that the Klinik did not adequately meet and confer prior to moving to compel production of its patient files. Hazelden Betty Ford asserts that "[t]he closest the parties had to a discussion regarding [this discovery request] was in the context of an email exchange" related to proposed search terms it had provided for searching the Klinik's patient files. Pls.' Mem. in Opp'n at 11. Hazelden Betty Ford asserts that, when the parties subsequently met and conferred on discovery issues, this request was not discussed. The Klinik maintains that the e-mail exchange was sufficient and additionally states that, in an earlier letter, it pointed out that Request for Production No. 7 "include[d] patient and potential patient files." Anderson Decl. ¶ 7 (quotation omitted).

9

The Federal Rules of Civil Procedure and this Court's Local Rules require that parties meet and confer with one another prior to motion practice in an effort to resolve the discovery in dispute. Fed. R. Civ. P. 37(a)(1) (motion to compel "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action"); D. Minn. LR 37.1(a) (requiring a motion brought under Fed. R. Civ. P. 37 to include "any certification required by a federal or local rule that the movant has in good faith conferred or attempted to confer with the party failing to act"); *see also* D. Minn. LR 7.1 (with certain exceptions, "the moving party must, if possible, meet and confer with the opposing party in a good-faith effort to resolve the issues raised by the motion"). "Before the court can rule on a motion [to compel], the parties must demonstrate they acted in good faith to resolve the issue among themselves." *Robinson v. Potter*, 453 F.3d 990, 995 (8th Cir. 2006). The meet-and-confer requirement "is only fulfilled when parties have engaged in a genuine and good-faith discussion about each discovery request that is in dispute." *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, No. 17-cv-5009 (JRT/KMM), 2019 WL 2024538, at *1 (D. Minn. May 8, 2019). As described by another magistrate judge in this District, "[t]he meet-and-confer requirement of the Local Rules is intended to lead to a meaningful, pre-motion-filing exchange of views between the parties to a lawsuit, and, if possible, to a full or partial resolution of the matter(s) that are the subject of a contemplated motion." *Marks v. Bauer*, No. 20-cv-1913 (ADM/JFD), 2021 WL 6050309, at *3 (D. Minn. Dec. 21, 2021) (quotation omitted); *see also Icenhower v. Total Auto., Inc.*, No. 14-cv-1499 (ADM/TNL), 2014 WL

10

4055784, at *2 (D. Minn. Aug. 15, 2014) ("[G]ood faith communications with opposing counsel can reduce or eliminate unnecessary motion practice.").

The earliest letter in which the Klinik asserts Request for Production No. 7 was raised with Hazelden Betty Ford is not part of the record before the Court. While the Court has no reason to doubt the representations of the Klinik's counsel that Request for Production No. 7 was *discussed*, the Court does not have the benefit of the context in which those discussions took place. The parties' e-mail exchange—on which the Klinik relies and which Hazelden Betty Ford contends is the "closest" the parties got—is in the record. *See generally* Ex. K to Decl. of Laura L. Myers, ECF No. 126-1; *see also* Anderson Decl. ¶ 6. Having reviewed this correspondence, the Court agrees with Hazelden Betty Ford's characterization of the communication and the primary focus on search terms, rather than any deficient production with respect to Request for Production No. 7 and Hazelden Betty Ford's patient files.

While ideally the parties would have conducted a more robust meet and confer on Request for Production No. 7 specifically, it is also plainly evident that the parties have reached an impasse on this issue—having both sought patient files from one another, having both refused to produce such files, and having both moved to compel the production of those files. *See generally infra* Section III.C.1. Therefore, consistent with the principles of Rule 1 of the Federal Rules of Civil Procedure, the Court will address Request for Production No. 7. *See* Fed. R. Civ. P. 1 (Federal Rules of Civil Procedure "should be construed, administer, and employed by the Court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"). In the

11

future, the Court expects any meet-and-confer discussions to address directly and meaningfully the specific discovery in dispute, rather than merely touch on its existence.

### b. Production of Patient Files

The Klinik asserts that Hazelden Betty Ford's patient files that refer or relate to the Klinik are relevant to (i) the likelihood of confusion, particularly considering the different geographical scope of the parties' respective marketplaces; (ii) Hazelden Betty Ford's alleged reputational harm; (iii) the extent to which Hazelden Betty Ford treated patients from Germany; and (iv) knowledge Hazelden Betty Ford had of the Klinik's use of the marks and any delay by Hazelden Betty Ford in the assertion of its rights.

Like the Klinik, *see generally infra* Section III.C.1, Hazelden Betty Ford opposes the production of its patient files. Hazelden Betty Ford points out that it "has already provided discovery relating to the geographic scope of its addiction treatment services"; its "patient records document treatment of patients[,] not reviews of competing clinics"; the Klinik relies on its own self-serving, unsupported statement that the parties referred patients and potential employees to one another; and it has already responded to other discovery requests relating to the timing of its knowledge regarding the Klinik, including requests for admissions that admit it was aware of the Klinik and the Klinik's use of marks and a domain name that included the words "Betty Ford" since August 2006. Pls.' Mem. in Opp'n at 15-17; *see* Ex. P at 80-82 to Myers Decl., ECF No. 126-1.

The Court denies the Klinik's motion with respect to the production of Hazelden Betty Ford's patient files. It is worth reiterating that the present dispute is not about the relevancy and production of documents generally responsive to Request for Production

No. 7, but specifically about whether patient files referring or relating to the Klinik must be produced.  With one qualified exception, *see infra* Section III.C.1.e, neither party has persuaded the Court as to the importance responsive information potentially contained *within patient files* has to resolving the issues this litigation, especially considering information that has been produced by Hazelden Betty Ford in response to Request for Production No. 7 and other discovery requests propounded by the Klinik that are likely to yield more relevant and useful information on issues such as geographic overlap, reputational harm, and knowledge of use.  *See* Fed. R. Civ. P. 26(b)(1) (considering "the importance of the discovery in resolving the issues").  Moreover, in this Court's view, the low probability and likelihood of responsive information being found in patient files is vastly outweighed by the weighty privacy interests of the patients in their personal medical information related to addiction treatment.  Accordingly, the Court concludes that the production of patient files is not proportional to the needs of this case and the Klinik's motion is denied as to Request for Production No. 7.

### 3.  Request for Production No. 14

Request for Production No. 14 seeks all documents concerning "complaints, orders, citations, or investigations concerning the quality, reliability, value, appropriateness, reasonableness or professionalism of any goods or services sold or offered for sale under . . . the Asserted Marks."  Def.'s Mem. in Supp. at 9 (quotation omitted).  This is another situation in which both parties have propounded similar requests on one another and each refused to produce the corresponding responsive information for itself.  *See infra* Section III.C.1.b.

13

The Klinik asserts that "[b]y alleging in its Amended Complaint that is has suffered a loss of goodwill, Hazelden [Betty Ford] has placed its purported reputation and goodwill relating to its facilities [and] services directly in issue." Def.'s Mem. in Supp. at 16-17 (citation omitted). The Klinik asserts that "[a] party cannot claim loss of goodwill or harm to reputation in a vacuum" and "[i]f a party's goodwill is low or non-existent, or if its reputation is tarnished or bad, little or no damage may have been suffered." Def.'s Mem. in Supp. at 17. Accordingly, the Klinik asserts that "the question of what Hazelden [Betty Ford]'s alleged reputation or goodwill is—or was—before and after [the Klinik's] alleged infringement is an issue open for discovery." Def.'s Mem. in Supp. at 17. The Klinik points to online articles and reviews it has gathered in support of its contention that Hazelden Betty Ford's reputation is not what Hazelden Betty Ford alleges it to be.

Hazelden Betty Ford contends that "[t]he question is not whether [it] has ever received a bad review from a disgruntled patient," but "whether [its] reputation is harmed by [the Klinik] offering competing services in connection with an infringing mark." Pls.' Mem. in Opp'n at 18. Hazelden Betty Ford points out that it "has already produced a plethora of documents evidencing its well-known and highly regarded reputation," Pls.' Mem. in Opp'n at 19, and contends that the proper "focus is on the quality of [the Klinik's] services, not superficial complaints against Hazelden Betty Ford," Pls.' Mem. in Opp'n at 18. Hazelden Betty Ford also contends that Request for Production No. 14 is overly broad and unduly burdensome as it does not contain a time limitation.

At the hearing, it came out that, generally speaking, Hazelden Betty Ford has a 10-

year file retention policy.  Tr. 18:20-19:6; *see* Tr. 18:17-19:6 (Hazelden Betty Ford does not have records "from that time period 2007, 2008").  The Klinik responded that it had not been aware of this.  Tr. 22:24-23:1.  In response to Hazelden Betty Ford's argument that the Klinik was seeking documents concerning complaints, orders, citations, or investigations going back 70 years, the Klinik clarified that it "never intended [Request for Production No. 14] to go back 70 years" and "[i]t sounds like the most we're looking at here is from 2009 forward."  Tr. 28:6-9.

Hazelden Betty Ford has alleged throughout the Amended Complaint that the Klinik has attempted to trade on the goodwill associated with its marks and, specifically, that it has suffered "a loss of good will associated with Hazelden's addiction treatment services or the Betty Ford Marks."  Am. Compl. ¶ 82; *see also* Am. Compl. ¶¶ 61, 73, 82, 96, 111.  "[Hazelden Betty Ford] squarely placed its reputation and goodwill at issue by alleging that [the Klinik's] challenged conduct caused it to suffer harm in those areas." *SiteLock LLC v. GoDaddy.com LLC*, No. CV-19-02746-PHX-DWL, 2021 WL 50453, at *11 (D. Ariz. Jan. 6, 2021).  "[The Klinik] is therefore entitled to pursue discovery bearing on whether [Hazelden Betty Ford's] own conduct might be the true cause of the change."  *Id.*; *see JUUL Labs, Inc. v. Chou*, No. 2:21-cv-03056-DSF-PD, 2022 WL 2165411, at *10 (C.D. Cal. Feb. 11, 2022) ("Evidence possessed by Plaintiff tending to show any decrease in value, caused by youth vaping or other means, during the period Defendants' infringement occurred could thus support Defendants' position that Plaintiff's demanded damages are unreasonable.").  Hazelden Betty Ford maintains that *SiteLock* is distinguishable because it "has already produced a plethora of documents

15

evidencing its well-known and highly regarded reputation," Pls.' Mem. in Opp'n at 19, whereas the production in *SiteLock* only "touch[ed] upon [the plaintiff's] public perception," 2021 WL 50453, at *11. But, it is axiomatic that Hazelden Betty Ford cannot limit its production to only those documents supporting its theory of the case.

Without any temporal scope, however, Request for Production No. 14 is overly broad. Based on the information provided at the hearing, the Court will grant the Klinik's motion in part and limit this request to responsive information from 2009 to the present.

### C. Hazelden Betty Ford's Motion

Broadly speaking Hazelden Betty Ford's motion can be broken down into three categories: (1) the Klinik's responses to certain discovery requests and the completeness of those responses as it relates to information in patient files; (2) corporate documents that may still be in possession of the Klinik's former chief executive officer; and (3) the depositions of the Klinik and its officers, directors, and managing agents.

### 1. Discovery Requests Implicating Patient Files

Aside from the depositions, the bulk of the parties' fight is over whether the Klinik needs to search its patient records for responsive information. Although somewhat more nuanced as this motion concerns both requests for production and interrogatories, the shoe is essentially on the other foot—Hazelden Betty Ford wants the Klinik to search through its patient files for responsive information, conducting the same sort of searching Hazelden Betty Ford was itself adamantly opposed to doing. As the Court noted above, *see supra* Section III.B.2.b, the proportionality considerations of Rule 26(b)(1) call for

16

careful balancing and due consideration as to the importance of the discovery sought in resolving the issues in this litigation, including but not limited to the extent to which responsive information is likely to be found in patient files measured against the weighty privacy interests of the patients in their personal medical information related to addiction treatment.

A substantial portion of the parties' arguments focus on the applicability (or lack thereof) of German and European Union privacy and healthcare laws and regulations. At the same time, both in its briefing and at the hearing, the Klinik maintains it "has not withheld from production any documents on the basis of German or EU privacy or healthcare laws except for its highly confidential patient files." Def.'s Mem. in Opp'n at 2, ECF No. 136; *see* Tr. 51:22-52:9 ("First off, I want to make one thing perfectly clear, I said this on page 2 of our briefing, I said it in my declaration: [The Klinik] has not withheld from production any documents on the basis of German privacy or healthcare laws, except for documents from its highly confidential patient files. Counsel was asking about the emails. We searched emails. We searched everything. We produced everything. The only universe of documents that has not been searched, and I don't know how many times I can say it, but you've got me under penalty of perjury, Your Honor, in a declaration, the only documents that are in the universe that's an issue here are the patient files. We searched everything else."); *see also, e.g.*, Def.'s Mem. in Opp'n at 10 ("To be clear, [the Klinik] has not withheld any documents on the basis of any German or EU privacy or healthcare laws or regulations, other than documents that may exist in its patient records and files."), 13 ("[The Klinik] has not withheld any documents

17

from production on the basis of privacy or healthcare laws or regulations, other than might possibly exist in its highly confidential patient treatment files."); Second Decl. of Alan M. Anderson ¶ 4 ("To the best of my understanding, no documents have been withheld from production by [the Klinik] on the basis of any German or EU privacy or healthcare law[s] or regulations, other than documents that may exist in its highly confidential patient treatment and therapy files."), ECF No. 140.

As discussed herein, the Court finds that the proper scope of discovery—with one exception—does not require the production of the Klinik's patient files. *See Grupo Petromax, S.A. De C.V. v. Polymetrix AC*, No. 16-cv-2401 (SRN/HB), 2019 WL 2241862, at *2-3 (D. Minn. May 24, 2019) (considering first the proper scope of discovery before any foreign blocking statutes).

### a. Request for Production Nos. 6 & 7

With respect to Request for Production Nos. 6 and 7, the parties' dispute is limited to whether the Klinik needs to search its patient files for response information. Request for Production No. 6 seeks "[a]ll documents relating to any confusion, suspicion, belief as to the relationship, connection, affiliation, or sponsorship between you or your services and Hazelden or its services, the Betty Ford Center, or its services, and/or Mrs. Betty Ford." Pls.' Mem. in Supp. at 16 (quotation omitted), ECF No. 108. Request for Production No. 7 seeks "[a]ll documents relating to any communications [the Klinik] has had with patients, or potential patients, who are from or reside in the United States, including inquiries about your services through your website, email, phone numbers, or social media accounts." Pls.' Mem. in Supp. at 16 (quotation omitted).

18

In relevant part, the Klinik objected to both requests "to the extent [they] seek[] documents protected by German or EU privacy or healthcare laws or regulations."  Ex. 4 at 48, 50 to Second Myers Decl., ECF No. 109-1.  Subject to this objection, the Klinik stated that it had no responsive documents to Request for Production No. 6 and would produce responsive documents to Request for Production No. 7 to the extent such documents exist.

Hazelden Betty Ford's motion is denied as to Request for Production Nos. 6 and 7 and the Klinik will not be required to search through its patient files for documents responsive to these requests.  With respect to Request for Production No. 6, the Court finds that the probability and likelihood of documents relating to any confusion between the Klinik and Hazelden Betty Ford in patient files to be low and outweighed by the weighty privacy interests of the patients in their personal medical information related to addiction treatment.  *See* Fed. R. Civ. P. 26(b)(1).  As for Request for Production No. 7, the Klinik "has produced copies of communications with individuals from the U.S. as found in its search of non-patient records."  Def.'s Mem. in Opp'n at 12.  In the context of *patient files*, the Court finds that "all documents" relating to "any communications" the Klinik had with patients or potential patients who are from or reside in the United States to be overly broad and not proportional to the needs of the case when responsive communications could implicate psychotherapy notes.

### b. Request for Production No. 8

Request for Production No. 8 is the equivalent to the Klinik's Request for Production No. 14.  *See supra* Section III.B.3.  It seeks "[a]ll documents relating to any

patient or third-party reviews, complaints, or investigations concerning your services, staff, or facilities." Pls.' Mem. in Supp. at 24 (quotation omitted). The Klinik objected to this request and did not produce responsive documents.

Hazelden Betty Ford asserts that information responsive to Request for Production No. 8 is relevant to its trademark-infringement claims and its contention that the Klinik's actions had a substantial effect on United States commerce. According to Hazelden Betty Ford, "patient or other third-party reviews, complaints, or investigations concerning [the Klinik's] services, staff, or facilities . . . are relevant to establishing the quality of [the Klinik's] services and any reputational harm that might flow from patient complaints and negative reviews." Pls.' Mem. in Supp. at 25. The Klinik, understandably, focuses on the one-sided nature of this request, with Hazelden Betty Ford refusing to produce the same information regarding itself that it now seeks from the Klinik. The Klinik also contends that Hazelden Betty Ford's relevancy argument is based on the assumption "that [the Klinik's] marks have been used in U.S. commerce to solicit U.S. clients," but, "[s]ince 2012, [the Klinik] has had a policy of not treating or targeting potential patients from the US."[4] Def.'s Mem. in Supp. at 14.

As noted by the district court, "[t]he Lanham Act's broad jurisdictional grant extends to extraterritorial infringements . . . ." *Hazelden II*, 2021 WL 3711055, at *4 (citing *Steele v. Bulova Watch Co.*, 344 U.S. 281, 286 (1952)); *see also, e.g.*, *Atl. Richfield Co. v. Arco Globus Int'l Co., Inc.*, 150 F.3d 189, 192 (2d Cir. 1998) ("The

---

[4] At the same time, the Klinik also "does not request or record citizenship or foreign residence information upon registration." Def.'s Mem. in Opp'n at 11.

Lanham Act may reach allegedly infringing conduct that occurs outside the United States when necessary to prevent harm to commerce in the United States.").  "It is well-settled that a showing of consumer confusion or harm to plaintiff's goodwill in the United States is sufficient to demonstrate a substantial effect on United States commerce." *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 143 (S.D. N.Y. 2011) (quotation omitted); *accord Hazelden II*, 2021 WL 3711055, at *5; *see also, e.g.*, *Rodgers v. Wright*, 544 F. Supp. 2d 302, 313 (S.D. N.Y. 2008) ("Financial harm to an American trademark owner whether from the loss of foreign sales or the damage to the trademark owner's reputation abroad is at the very least, relevant to determining whether foreign infringement has a substantial effect on U.S. commerce."); *cf. Coca-Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir. 1980) ("A substantial effect on interstate commerce is present when the trademark owner's reputation and good will, built up by use of the mark in interstate commerce, are adversely affected by an intrastate infringement." (quotation omitted)). Documents responsive to Request for Production No. 8 are relevant to Hazelden Betty Ford's allegations that is has sustained reputational harm.  The Klinik's argument that reviews, complaints, or investigations concerning its services, staff, or facilities are not probative of the determination as to whether there has been a substantial effect on United States commerce because (presumably) they do not involve United States citizens goes more to the merits and weight of such evidence rather than its relevancy to Hazelden Betty Ford's claims of reputational harm.

But, like the Klinik's Request for Production No. 14, Request for Production No. 8 also lacks any sort of temporal scope.  Without any time limitation, it too is overly broad.

The Court will similarly limit Request for Production No. 8 to responsive information from 2009 to the present.

Additionally, the Klinik will not be required to search through its patient files for documents responsive to Request for Production No. 8. Here too, the Court finds that the probability and likelihood of responsive information being found in patient files is vastly outweighed by the weighty privacy interests of the patients in their personal medical information related to addiction treatment. *See* Fed. R. Civ. P. 26(b)(1).

In sum, Hazelden Betty Ford's motion is granted in part with respect to Request for Production No. 8 to the extent the Klinik has responsive documents outside of patient files that relate to any patient or other third-party reviews, complaints, or investigations concerning its services, staff, or facilities between 2009 and the present.

### c.  Request for Production No. 9

Request for Production No. 9 seeks "[a]ll documents relating to [the Klinik's] success rate with respect to patients abstaining from substance abuse after receiving [its] services." Pls.' Mem. in Supp. at 25 (quotation omitted).

Hazelden Betty Ford asserts that documents responsive to Request for Production No. 9 "are relevant to showing either that [the Klinik's] services are of an inferior quality—which is relevant to the claim that [the Klinik's] infringing use harms Hazelden Betty Ford's reputation and goodwill—or that its services are of comparable quality— which is relevant to proving likelihood of confusion in the marketplace." Pls.' Mem. in Supp. at 25. Hazelden Betty Ford further asserts that "[a]ccording to interviews with [the Klinik's] administrative director and its own internal documents, [the Klinik] measures

the success of its addiction treatment program by conducting post-treatment surveys with its patients one year after receiving treatment." Pls.' Mem. in Supp. at 26.

The Klinik counters that "[n]either Hazelden [Betty Ford] nor [the Klinik] use some sort of 'success rate' to try to solicit clients." Def.'s Mem. in Opp'n at 14. The Klinik contends what constitutes "success rate" in the field of substance-abuse treatment is vague and "can be measured in multiple ways," resulting in the unreliability and therefore irrelevance of the information. In support of its argument, the Klinik includes pages from a section of Hazelden Betty Ford's website titled "Comparing Alcohol and Drug Rehab Success Rates." Second Anderson Decl. ¶ 22; *see generally* Ex. M to Second Anderson Decl., ECF No. 140-13. Hazelden Betty Ford's own website cautions that "[i]n general, the substance abuse treatment field lacks consistently reported—and, in some cases, scientifically valid—ways of measuring the impact of alcohol and drug rehab programs" and there is an "absence of apples to apples comparison data." Ex. M at 2 to Second Anderson Decl.; *see also id.* at 4 ("Standard criteria for measuring treatment effectiveness are not available at this time . . . ."), (noting "the lack of consistently reported, scientifically valid addiction treatment outcomes data across the field"). Hazelden Betty Ford's website further explains that "[w]ith alcoholism and drug addiction—known medically as substance use disorder—there aren't clear-cut physiological indicators or lab tests that demonstrate whether the disease is subsiding or the patient is healing," and, "[i]nstead, addiction treatment outcomes are typically assessed across a variety of clinical, quality of life and behavioral domains." Ex. M at 3 to Second Anderson Decl. In evaluating the credibility of such statistics, Hazelden Betty

Ford's website advises the consumer to consider the particular definition of success used, the method of data collection, the time period used, the number of people surveyed and the response rate, and the type of program in which the responding individuals participated.  Ex. M at 4 to Second Anderson Decl.

The Klinik further states that, in any event, Hazelden Betty Ford is already in possession of the article discussing a magazine interview with its administrative director, including "the question of recidivism" and "how many patients abstain from abstinence." Ex. 22 at 246 to Decl. of Laura L. Myers [hereinafter Second Myers Decl.], ECF No. 109-1.  The Klinik also produced a presentation it made addressing "abstinence" data 12 months after discharge.  *See* Def.'s Mem. in Opp'n at 15; Tr. 53:8-10, 67:16-17; *see generally* Ex. 23 to Second Myers Decl., ECF No. 110.

When asked at the hearing what its response was to the argument that neither Hazelden Betty Ford nor the Klinik uses a "success rate" to solicit clients, Hazelden Betty Ford's answer was largely non-responsive, focusing instead on the fact that the Klinik "do[es] measure success rate"—which is not in dispute—and asserting that "if [they] have information, and we know they do, and we know they track it, then that information needs to be searched appropriately."  Tr. 67:13-21.

In considering the likelihood of consumer confusion, some courts take into account the respective quality of the products.[5]  As explained by the Second Circuit:

---

[5] "In determining whether there is a likelihood of confusion, [the Second Circuit Court of Appeals] appl[ies] the eight-factor balancing test introduced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961)." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).  One of these factors is the "respective quality of the products." *Id.*  The remaining seven factors are the "strength of the trademark," "similarity of the marks," "proximity of the products and their competitiveness with one another," "evidence that the

> If the quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, i.e., through dilution of the senior user's brand.  A marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user.  Conversely, where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution.

*Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004) (citations omitted); *see also*

*Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993) ("We have taken two approaches

about the quality of the junior user's product: (1) an inferior quality product injures the

senior user's reputation because people may think they come from the same source; or (2)

a product of equal quality promotes confusion that they come from the same source.").

Acknowledging that Hazelden Betty Ford has alleged reputational harm and

accepting for purposes of this motion that the respective quality of the parties' products—

namely, addiction treatment services—may be relevant to the overall calculus in

assessing the likelihood of confusion, the Court finds that documents responsive to

Request for Production No. 9 are of little relevance in evaluating the "quality" of these

particular "products" in the marketplace.  Neither party has claimed that the other

attempts to distinguish itself to consumers on the basis of its "success rate," whatever that

may be.  Indeed, Hazelden Betty Ford's own website urges caution in this area and

advises as to the limited utility of such information when it exists.  Moreover, the Court

---

senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product," "evidence of actual consumer confusion," "evidence that the imitative mark was adopted in bad faith," and "sophistication of consumers in the relevant market." *Id.*

has already ordered each party to produce complaint-related information. *See supra* Sections III.B.3, C.1.b. Accordingly, the Court concludes that Request for Production No. 9 is not proportional to the needs of the case when considering the minimal importance responsive information is likely to have in resolving the issues in this litigation and Hazelden Betty Ford's motion is denied with respect to this request. *See* Fed. R. Civ. P. 26(b)(1); *see also Lynch*, 569 F. Supp. 3d at 963 ("A court may find that a request on its face is not proportional to the needs of the case, given the relevance of the requested discovery." (quotation omitted)).

### d.  Request for Production No. 23

Request for Production No. 23 seeks "[d]ocuments sufficient to identify the cost of treatment at [the Klinik's] facility." Pls.' Mem. in Supp. at 26 (quotation omitted).

Hazelden Betty Ford asserts that the cost of treatment at the Klinik is "relevant to [its] trademark-infringement claim because courts generally consider the costs of goods and services when assessing the likelihood of confusion." Pls.' Mem. in Supp. at 27. Hazelden Betty Ford additionally asserts that, "to the extent consumers perceive a connection between the parties, the pricing of [the Klinik's] services can negatively impact Hazelden[ Betty Ford's] reputation and/or generate a substantial effect on U.S. commerce." Pls.' Mem. in Supp. at 27 (citations and footnote omitted).

The Klinik counters that the cost of its addiction treatment services is not relevant because a consumer's selection of a treatment facility is not comparable to the selection of other sorts of products by an unsophisticated consumer who may be led to purchase based on price. Similar to its arguments with respect to the relevancy of its "success

26

rate," the Klinik also contends that costs are not a comparable metric between the parties and can vary widely based on things like the level of care, type of programming, and duration of treatment involved as well as the availability of insurance coverage and financial assistance. The Klinik points out that "the cost of health care is markedly lower in Germany than in the U.S." Def.'s Mem. in Opp'n at 16. Lastly, the Klinik contends that Hazelden Betty Ford already has information regarding its costs, estimated at €450 per day.[6]

As stated by the Eighth Circuit in *SquirtCo.*, "the kind of product, *its cost* and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." 628 F.2d at 1091 (emphasis added); *see, e.g.*, *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054-55 (8th Cir. 2005) (taking into consideration whether the products at issue are "priced or sold in a manner that suggests a high level of consumer sophistication or deliberation in the identification of a product source"). This requires "stand[ing] in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 447 (8th Cir. 2018) (quotation omitted). "As a general matter, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making

---

[6] Both parties cite to an article Hazelden Betty Ford obtained from the Klinik's website and attached in support of its motion to compel. *See* Pls.' Mem. in Supp. at 27 n.3 (citing Ex. 24 to Second Myers Decl., ECF No. 109-1); Def.'s Mem. in Opp'n at 16-17 (citing same). With the exception of some of the larger headings, portions in bigger font, and the website address, the article contained in Exhibit 24 to the Second Myers Declaration is largely illegible. There does not, however, appear to be any dispute as to the Klinik's daily rate. *See, e.g.*, Tr. 54:24 ("They know our cost is 450 Euros a day.").

27

decisions, and therefore the likelihood of confusion decreases." *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 543 F. Supp. 3d 695, 717 (D. Minn. 2021) (quotation omitted); *see also, e.g.*, *Kibler v. Hall*, 843 F.3d 1068, 1080 (6th Cir. 2016) (consumers more likely to exercise caution when "items are particularly expensive").

It may be that consumers of addiction treatment services like, for example, consumers of banking services, "exercise a relatively high degree of care." *First Nat'l Bank in Sioux Falls v. First Nat'l Bank, S.D.*, 153 F.3d 885, 889 (8th Cir. 1998) (consumers exercising a higher degree of care "more likely to notice what, in other contexts, may be relatively minor differences in names"). It may be that the overall cost of addiction treatment services, even with considerations such as the availability of insurance coverage, are such that consumers tend to exercise a higher degree of care in purchasing such services. *See, e.g.*, *Kibler*, 843 F.3d at 1080; *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983) ("There is always less likelihood of confusion where goods are expensive and purchased after careful consideration."); *see also Kemp*, 398 F.3d at 1055 (citing *Astra Pharm. Prods.*); *cf. Select Comfort Corp.*, 996 F.3d 925 at 936 ("On the one hand, mattresses are relatively expensive among most consumers' purchases."). But, it may also be that, because addiction treatment services are purchased infrequently, consumers are less sophisticated and confusion is more likely. *Cf. Select Comfort Corp.*, 996 F.3d at 937 ("On the other hand, most people buy mattresses infrequently, so they enter the marketplace uneducated and susceptible to fast-talking sales people and brand confusion."). In the end, the Klinik's arguments again go more to the weight of any such cost evidence rather than its

28

relevancy to Hazelden Betty Ford's trademark-infringement claim. Given the fact-intensive inquiry involved in assessing the likelihood of confusion and the role the cost of a product can have in that analysis, the Court concludes Request for Production No. 23 seeks information relevant to Hazelden Betty Ford's trademark-infringement claim.

At the same time, Klinik will not be required to produce documents from its patient files in response to Request for Production No. 23. The cost a particular patient paid at a particular point in time for particular addiction treatment services at the Klinik is less important to addressing issues related the likelihood of confusion than the sorts of more generalized cost information available elsewhere and without compromising the weighty privacy interests of the patients in their personal medical information related to addiction treatment. *See* Fed. R. Civ. P. 26(b)(1).

Therefore, Hazelden Betty Ford's motion is granted in part with respect to Request for Production No. 23 to the extent the Klinik has responsive documents outside of patient files that relate to the cost of treatment at its facility.

### e. Request for Production Nos. 18 and 22

Unlike Request for Production No. 7, for example, which seeks "*[a]ll documents relating to any communications [the Klinik] has had with patients, or potential patients, who are from or reside in the United States,*" Request for Production Nos. 18 and 22 seek information in the aggregate that is "sufficient to identify the number of persons from or who reside in the United States with which [the Klinik] has communicated in any way regarding its addiction treatment services" and "to identify the number of persons from or who reside in the United States to whom [the Klinik] has provided addiction treatment

29

services to in any way and at any time." Pls.' Mem. in Supp. at 16 (emphasis added).

The Klinik argues that "EU and German GDPR law[s] and regulations clearly prohibit the production of [its] patient records." Def.'s Mem. in Opp'n at 30. Relying on the declaration of a German attorney specializing in "information technology law" and holding data-protection certifications, *see* Decl. of Dr. Andrea Kirsch ¶ 4, ECF No. 138, the Klinik argues that such production would violate the European Union's General Data Protection Regulation ("GDPR"), Regulation (EU) 2016/679, as well as German civil and criminal law. *See generally* Ex. A to Kirsch Decl., ECF No. 138-1.

### i.    Prohibition Under the GDPR & *Schrems II*

"[T]he party relying on foreign law to resist discovery has the burden to show such law applies to the discovery at issue." *Grupo Petrotemex*, 2019 WL 2241862, at *2; *see also, e.g.*, *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-04394 (AJN/BCM), 2017 WL 7512815, at *4 (S.D. N.Y. Dec. 29, 2017) ("Where the alleged obstacle to production is foreign law, the burden of proving what that law is and demonstrating why it impedes production falls on the party resisting discovery." (quotation omitted)). As an initial matter, the Court harbors considerable doubt that the discovery Hazelden Betty Ford seeks is prohibited under either the GDPR or a decision by the Court of Justice of the European Union known as Case No. C-311/18, *Data Protection Commissioner v. Facebook Ireland Ltd.* [hereinafter *Schrems II*], *available at* https://curia.europa.eu/juris/document/document.jsf?text=&docid=228677&pageIndex=0 &doclang=EN&mode=lst&dir=&occ=first&part=1&cid=130309.

As Hazelden Betty Ford pointed out at the hearing, the GDPR permits the

processing and transfer of "data concerning health"[7] when it "is necessary for the establishment, exercise or defence of legal claims."   GDPR arts. 9(2)(f) (processing), 49(1)(e) (transfer).  *Cf. Knight Capital Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F. Supp. 3d 681, 687 (E.D. Mich. Nov. 30, 2017) (noting "express exception to the broad prohibitions on persona data disclosure" in the German Federal Data Protection Act for "the establishment, exercise, or defence of legal claims" (quotation omitted)); *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 104 F. Supp. 3d 1150, 1163 (D. Or. 2015) (noting transfers permitted "for the establishment, exercise or defence of legal claims" under Germany's Federal Data Protection Law/Bundesdatenschutzgesetz); *BrightEdge Techs., Inc. v. Searchmetrics, GmbH*, No. 14-cv-01009-WHO (MEJ), 2014 WL 3965062, at *4 (N.D. Cal. Aug. 13, 2014) (same).  According to Dr. Kirsch, the GDPR requires that "[i]t is necessary that the alleged claimant or opponent plausibly demonstrates that the data is relevant to the evidence."  Ex. A at 10 to Kirsch Decl.  Dr. Kirsch concluded that "[i]t is not evident in the present case that the transfer of the entire patient files is necessary for the defense against potential claims of Hazelden [Betty Ford]," and therefore, in the absence of necessity, the GDPR would prohibit production.  Ex. A at 10 to Kirsch Decl. (analysis under GDPR art. 9(2)(f)); *see also id.* at 16-18 (analysis under GDPR art. 49(1)(e)).    Respectfully, the Court disagrees with Dr. Kirsch's conclusion as to relevancy and, for the reasons stated below, *see infra* Section III.C.1.e.ii, finds that this information is highly relevant to the claims and defenses in this litigation.

---

[7] The GDPR defines "data concerning health" as "personal data related to the physical or mental health of a natural person, including the provision of health care services, which reveal information about his or her health status." GDPR art. 4(15).  For purposes of this motion, the Court assumes without deciding that the responsive documents sought by Hazelden Betty Ford would qualify as "data concerning health."

Further, the *Schrems II* decision on which the Klinik relies is inapposite.  First, it did not concern the processing or transferring of personal data in connection with the establishment, exercise, or defense of legal claims, but rather personal data being transferred from one private company in a European Union Member State to another private company located in a non-European Union country "for a commercial purpose." *Schrems II* ¶ 68; *see also id.* ¶ 80 (whether GDPR "applies to the transfer of personal data by an economic operator established in a Member State to another economic operator established in a third country").  Second, *Schrems II* expressly acknowledged that Article 49 of the GDPR "details the conditions under which transfer of personal data to third countries may take place in the absence of an adequacy decision under Article 45(3) of the GDPR or appropriate safeguards under Article 46 of the GDPR."  *Schrems II* ¶ 202. Thus, although *Schrems II* invalidated a prior Court of Justice decision known as the "Privacy Shield Decision" wherein it was found that "the United States ensures an adequate level of protection for personal data transferred from the Union to organisations in the United States under the EU-U.S. Privacy Shield,"[8] *Schrems* ¶ 46, it did not foreclose and, in fact, *expressly contemplated* the continued transfer of personal data under the conditions set forth in Article 49.  Article 49 permits the transfer of personal data to a third country, "[i]n the absence of an adequacy decision pursuant to Article

---

[8] The Court of Justice found "that Article 1 of the Privacy Shield Decision [wa]s incompatible with Article 45(1) of the GDPR . . . . and [wa]s therefore invalid."  *Schrems II* ¶ 199.  Because "Article 1 of the Privacy Shield decision [wa]s inseparable from Articles 2 and 6 of, and the annexes to, that decision, its invalidity affect[ed] the validity of the decision in its entirety" and the Court of Justice held "that the Privacy Shield Decision [wa]s invalid."  *Schrems II* ¶ 200; *see also Schrems II*  Ruling ¶ 5 ("Commission Implementing Decision (EU) 2016/1250 of 12 July 2016 pursuant to directive 95/46/EC of the European Parliament and of the Council on the adequacy of protection provided by the EU-US Privacy Shield is invalid.").

45(3), or of appropriate safeguards pursuant to Article 46," when "the transfer is necessary for the establishment, exercise or defence of legal claims."   GDPR art. 49(1)(e).

### ii.    Analysis Under *Aérospatiale*

The Supreme Court has observed that "it is well settled that [foreign 'blocking'] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."  *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Ia.*, 482 U.S. 522, 544 n.29 (1987) [hereinafter *Aérospatiale*]; *see also, e.g.*, *Grupo Petrotemex*, 2019 WL 2241862, at *1; *Finjan, Inc. v. Zscaler, Inc.*, No. 17-cv-06946-JST (KAW), 2019 WL 618554, at *1 (N.D. Cal. Feb. 14, 2019); *AnywhereCommerce, Inc. v. Ingenico Corp.*, No. 19-cv-11457-IT, 2020 WL 5947735, at *1 (D. Mass. Aug. 31, 2020) [hereinafter *AnywhereCommerce I*], *reconsidered in part*, 2021 WL 2256273 (D. Mass. June 3, 2021) [hereinafter *AnywhereCommerce II*].  At the same time, the Supreme Court has directed "American courts . . . [to] take care to demonstrate due respect for any special problem confronted by the foreign litigant on account if its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state" in recognition of "the demands of comity in suits involving foreign states."  *Aérospatiale*, 482 U.S. at 546; *see also Grupo Petrotemex*, 2019 WL 2241862, at *1.  "In suits involving extraterritorial discovery, '[t]he exact line between reasonableness and unreasonableness in each case must be drawn by the trial court, based on its knowledge of the case and . . . the governments whose statutes and policies they invoke.'"  *Grupo*

33

*Petrotemex*, 2019 WL 2241862, at *1 (alternation in original) (quoting *Aérospatiale*, 482 U.S. at 546).

At bottom, "[w]hen a foreign party relies on foreign law to resist production of discoverable information, a court should balance its interests with the interests of the foreign sovereign." *In re Baycol Prods. Litig.*, No. MDL 1431 (MJD/JGL), 2003 WL 22023449, at *6 (D. Minn. Mar. 21, 2003); *accord Grupo Petrotemex*, 2019 WL 2241862, at *6; *cf. Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 418 (S.D. N.Y. 2016) ("[D]istrict court decisions from this Circuit and other Circuits have found that Germany's data protection laws, which also implemented the EU Directive, warranted a comity analysis.") (citing cases).  To assist in the balancing of interests when determining whether to direct the production of information or documents in contravention of foreign law, courts consider:

> (1) The importance to the litigation of the information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means to obtain the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the foreign country.

*Grupo Petrotemex*, 2019 WL 2241862, at *6 (citing *Aérospatiale*, 482 U.S. 544 n.28); *see Laydon*, 183 F. Supp. 3d at 419-20; *see also, e.g.*, *In re Baycol Prods. Litig.*, 2003 WL 22023449, at *6.

Beginning with the importance of the information requested, documents responsive to Request for Production Nos. 18 and 22 "go[] to the heart" of the issue of

whether there has been a substantial impact on United States commerce. *Knight Capital Partners Corp.*, 290 F. Supp. 2d at 290; *see Hazelden II*, 2021 WL 3711055, at *6 (discovery needed to prove Lanham Act clams, including "facts demonstrating . . . [the] Klinik's treatment of, communications with, and revenue received from patients who are from or reside in the United States"); *see also Grupo Petrotemex*, 2019 WL 2241862, at *6. "This factor therefore favors compelling the disclosure of the documents requested, notwithstanding that some of those documents may include some personal information of foreign citizens." *Knight Capital Partners Corp.*, 290 F. Supp. 3d at 690.

Turning next to the specificity of the requests, as noted above, Request for Production Nos. 18 and 22 seek information in the aggregate, rather than *all* documents relating to *any* communications the Klinik has had with patients or potential patients who are from or reside in the United States, and thus are more narrowly tailored than an all-encompassing "all documents" request. For example, billing invoices the Klinik has sent to individuals from or who reside in the United States in connection with treatment services would supply "facts demonstrating . . . [the] Klinik's treatment of, communications with, and revenue received from patients who are from or reside in the United States" without encroaching upon intensely private patient records related to psychotherapeutic treatment. *Hazelden II*, 2021 WL 3711055, at *6; *see* Ex. A at 4 to Kirsch Decl. ("An essential part of the [Klinik's] therapy is psychotherapeutic treatment."). Therefore, this factor also likely favors compelling disclosure.

As to whether the information originated in the United States, Hazelden Betty Ford does not dispute that "it seems likely that [the Klinik's] documents originated in

Germany given that [the Klinik's] business and employees are there." Pls.' Mem. in Supp. at 19. "The fact that all the information to be disclosed is located in a foreign country weighs against disclosure, since those people and documents are subject to the law of that country in the ordinary course of business." *BrightEdge Techs.*, 2014 WL 3965062, at *5 (quotation omitted). This factor consequently weights against compelling disclosure of responsive documents contained within the Klinik's patient files. *See, e.g.*, *Grupo Petrotemex*, 2019 WL 2241862, at *6; *Royal Park Investments*, 2017 WL 7512815, at *10; *BrightEdge Techs.*, 2014 WL 3965062, at *5; *In re Baycol Prods. Litig.*, 2003 WL 22023449, at *6. *But see AnywhereCommerce II*, 2021 WL 2256273, at *3 ("While the location of the materials is a weighty consideration in the comity analysis . . . , that favor does not override the other four factors that, in this instance, tilt heavily in favor of disclosure."); *BrightEdge Techs.*, 2014 WL 3965062, at *5 (factor "not determinative").

With respect to whether there are alternative means available to secure the information, "[i]f the information sought can be easily obtained elsewhere, there is little or no reason to require a party to violate foreign law." *Finjan*, 2019 WL 618554, at *2 (quotation omitted); *accord BrightEdge Techs.*, 2014 WL 3965062, at *5. At the hearing, the Court tried to explore whether alternative means other than patient files were available sufficient to identify the *number* of people from or who reside in the United States that the Klinik has communicated with regarding its addiction treatment services or to whom the Klinik has provided addiction treatment services. The record before the Court reflects that information concerning a patient's address is "recorded in the

registration data." Ex. A at 4 to Kirsch Decl. The Klinik does not dispute that it collects patient address information as part of the intake process. *See* Tr. 82-23-83:5; Ex. 3 at 28 to Second Myers Decl. ("[B]ased on investigation and discovery to date, [the Klinik] does not regularly collect citizenship information at the time of patient registration. Residence information is only collected to the extent needed for invoicing.") (initial response to Interrogatory No. 2), ECF No. 109-1. Moreover, it appears at least possible for the Klinik to search its records for patient nationality information. *See generally* Ex. 25 to Second Myers Decl. (locating information regarding possible Dutch patients), ECF No. 111. Accordingly, based on the present record before the Court, it appears that there may be alternative means available to responding to Request for Production Nos. 18 and 22 outside of the Klinik's patient files. The availability of other reliable means sufficient to identify the number of people from or who reside in the United States that the Klinik has communicated with regarding its addiction treatment services or to whom the Klinik has provided addiction treatment services would counsel against compelling the production of patient files.

"The fifth factor—the balancing of national interests—is the most important, as it directly addresses the relations between sovereign nations." *Laydon*, 183 F. Supp. 3d at 422 (quotation omitted). As the district court previously observed, "the United States has an interest in adjudicating disputes related to the trademarks, patents, and business interests of U.S.-based corporations," particularly "when a defendant argues—as [the] Klinik has here—that the plaintiff would be barred from seeking relief in the Courts where defendant is domiciled, thereby suggesting that there is no other forum in which

Plaintiffs can adjudicate their grievances." *Hazelden I*, 504 F. Supp. 3d at 977-78; *cf. Finjan*, 2019 WL 618554, at *3.   And, more generally, the United States "has a substantial interest in vindicating the rights of American plaintiffs." *BrightEdge Techs.*, 2014 WL 3965062, at *5 (quotation omitted); *see also Knight Capital Partners Corp.*, 290 F. Supp. 3d at 690 (non-compliance "would fatally undermine the important interest of the United States in rendering an adequately informed decision on the rights of a civil plaintiff before it").

It cannot be reasonably doubted that "Germany clearly has an interest in the data privacy of its citizens." *St. Jude Medical S.C.*, 104 F. Supp. 3d at 1164; *see also Laydon*, 183 F. Supp. 3d at 423 ("[C]ourts have repeatedly held that European nations bound by the EU Directive have an interest in protecting the privacy rights of their citizens." (quotation omitted)).   Yet, it is worth noting that "Germany itself has made no expression of any sovereign interest in this case." *St. Jude Medical S.C.*, 104 F. Supp. 3d at 1165 n.11; *see also Laydon*, 183 F. Supp. 3d at 424 ("[C]ourts often look to whether the foreign government has raised an objection to the discovery sought.   A foreign government's failure to express a view that the disclosure at issue threatens its national interests militates against a finding that strong national interests of the foreign country are at stake." (quotations and citations omitted)).   And, "where the issue is the application of another country's privacy laws, [courts often look to] whether such privacy requirements are absolute." *Laydon*, 183 F. Supp. 3d at 420 (quotation omitted); *see Royal Park Investments*, 2017 WL 7512815, at *11; *St. Jude Medical S.C.*, 104 F. Supp. 3d at 1164. One court has observed that provisions similar to those in Articles 9(2)(f) and 49(1)(e) of

the GDPR, "which appear on their face to encompass disclosure under court order for litigation purposes," "demonstrate that [Germany's] interest is not all-consuming." *St. Jude Medical S.C.*, 104 F. Supp. 3d at 1164; *see also Knight Capital Partners Corp.*, 290 F. Supp. 3d at 691 (taking into account "the statute on point expressly allows disclosures that are necessary for the purposes of litigation").

Protective orders can also help ameliorate privacy concerns. *See, e.g.*, *AnywhereCommerce II*, 2021 WL 2256273, at *3; *Finjan*, 2019 WL 618554, at *3; *Royal Park Investments*, 2017 WL 7512815, at *11; *Knight Capital Partners Corp.*, 290 F. Supp. 3d at 690-91; *Laydon*, 183 F. Supp. 3d at 425. The Court has entered a Protective Order in this case that allows the parties to designate "confidential healthcare records" and "medical records" as "Confidential – Attorneys' Eyes Only," the highest level of protection. ECF No. 90 at 5. Likewise, Local Rule 5.6 provides a procedure for filing documents under seal. *See generally* D. Minn. LR 5.6. On balance, and with the existing additional protections available under the Protective Order and this Court's Local Rules, the Court finds that this factor likewise favors disclosure.

Lastly, while not one of the five factors, courts have also considered the hardship of compliance on the party and "whether production could expose the producing party to fines or criminal sanctions." *Royal Park Investments*, 2017 WL 7512815, at *11. "If a foreign company is likely to face criminal prosecution in a foreign country for complying with a United States court order, that is a weighty excuse for nonproduction." *BrightEdge Techs.*, 2014 WL 3965062, at *5. "If the likelihood that the party resisting compliance will be prosecuted and convicted is slight and speculative[,] a court can order

disclosure." *Id.* (quotation omitted); *see Finjan*, 2019 WL 618554, at *3 (considering whether there is "evidence of the extent to which the government enforces its laws"); *Knight Capital Partners*, 290 F. Supp. 3d at 691 (considering whether party had "pointed to any information to suggest that it faces a plausible risk of an enforcement action by German authorities"). The Court appreciates the Klinik's concern over being "struck with substantial penalties" or having its personnel "face criminal prosecution." Def.'s Mem. in Opp'n at 31. The Court also recognizes that Dr. Kirsch has pointed to instances in which Dutch and Danish clinics were fined under the GDPR and situations in which the German Criminal Code was found to have been violated. *See* Ex. A at 19 to Kirsch Decl. Respectfully, none of these fact scenarios involved the processing and transferring of personal data in the context of litigation.

In the end, as stated in *Grupo Petrotemex*, "[t]here is no formula by which to measure and weigh these competing interests . . . ." 2019 WL 2241862, at *7. Having concluded, however, that the information sought in Request for Production Nos. 18 and 22 goes to the heart of whether there is a substantial effect on United States commerce, the balance of interests weighs in favor of compelling the Klinik to produce its patient files if that is the only reasonably reliable means sufficient to identify the number of people from or who reside in the United States that the Klinik has communicated with regarding its addiction treatment services or to whom the Klinik has provided addiction treatment services. The Klinik and its counsel are in the best position to educate Hazelden Betty Ford and its counsel on any available alternatives and their degree of reliability. The Klinik would also appear to be incentivized to do so in earnest to avoid

potential entanglements with European Union and German privacy and healthcare laws and regulations. Consistent with its responsibility to consider proportionality in discovery, Hazelden Betty Ford would do well to consider in good faith any reasonably reliable alternative means. *See* Fed. R. Civ. P. 26(b)(1), (2)(C)(i); *Vallejo*, 903 F.3d at 742; *cf.* Fed. R. Civ. P. 1. Therefore, Hazelden Betty Ford's motion is granted in part as to Request for Production Nos. 18 and 22 and the Klinik shall produce patient files responsive to these requests if patient files are the only reasonably reliable means sufficient to identify the number of people from or who reside in the United States that the Klinik has communicated with regarding its addiction treatment services or to whom the Klinik has provided addiction treatment services.[9]

### f.  Interrogatory Nos. 2, 3, 4 & 5

Hazelden Betty Ford moves for an order compelling the Klinik to supplement its responses to Interrogatory Nos. 2, 3, 4, and 5, essentially asserting that these responses "are incomplete because [the Klinik] refused to search its patient records to obtain relevant information." Pls.' Mem. in Supp. at 6.

Under Rule 33 of the Federal Rules of Civil Procedure, "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(4). "The answers to interrogatories must be responsive, full,

---

[9] In its opposition to Hazelden Betty Ford's motion, the Klinik states that it "proposed a protocol to electronically search its patient records for relevant references to the U.S.," thus "offer[ing] a means of addressing Hazelden[ Betty Ford's] alleged desire to see if any patients from 2015, the first year in which [the Klinik] has electronic records, had U.S. citizenship or residency," but Hazelden Betty Ford refused to cooperate. Def.'s Mem. in Opp'n at 17-18. The Klinik states that Hazelden Betty Ford "should be ordered to cooperate with [the Klinik] on its protocol and reasonable search terms." Def.'s Mem. in Opp'n at 17 (capitalization omitted). To the extent the Klinik is trying to use its opposition to seek relief from the Court related to any protocol for searching electronically stored information, such request is not properly before the Court.

complete and unevasive." *Essex Builders Grp., Inc. v. Amerisure Ins. Co.*, 230 F.R.D. 682, 685 (M.D. Fla. Sept. 7, 2005) (quoting *Continental Ill. Nat'l Bank & Trust Co. v. Caton*, 136 F.R.D. 682, 684 (D. Kan. 1991)). "[P]arties are under a duty to complete a reasonable investigation when presented with the opposing party's interrogatories." *3M Innovative Props. Co. v. Tomar Elec.*, No. 05-cv-756 (MJD/AJB), 2006 WL 2670038, at *6 (D. Minn. Sept. 18, 2006); *see also, e.g.*, *Holcombe v. Helena Chemical Co.*, No. 2:15-cv-2852-PMD, 2017 WL 713920, at *3 (D. S.C. Feb. 23, 2017) ("[P]arties answering interrogatories have a duty to undertake reasonable investigative efforts to find properly requested information."). "The answering party cannot limit his answers to matters within his own knowledge and ignore information immediately available to him or under his control." *Essex Builders Grp.*, 230 F.R.D. at 685 (quoting *Continental Ill. Nat'l Bank & Trust Co.*, 136 F.R.D. at 684); *see Linholm v. BMW of N. Am., LLC*, No. 3:15-CV-03003-RAL, 2016 WL 452315, at *5 (D. S.D. Feb. 5, 2016) ("The majority interpretation of Rule 33 requires that a corporation furnish such information as is available from the corporation itself or from sources under its control." (quotation and emphasis omitted)).

Arguably, the Klinik's initial responses to Interrogatory Nos. 2 and 5 were incomplete when the responses indicated that the Klinik's "[t]reatment files may contain further information."[10]    Ex. 3 at 28, 30 to Second Myers Decl.    With its amended

---

[10] For purposes of completeness, the Klinik further explained that the files could not "easily be searched, i[f] at all, and applicable privacy and healthcare laws and regulations may prohibit the searching and production of such files themselves." Ex. 3 at 28 to Second Myers Decl., ECF No. 109-1; Ex. 3 at 30 to Second Myers Decl. (same). *Cf. Essex Builders Grp.*, 230 F.R.D. at 685 ("If the answering party lacks necessary information to make a full, fair and specific answer to an interrogatory, it should so state under oath and should set forth in detail the efforts made to

responses, however, the Klinik removed this language and answered based on its "investigation and discovery to date."  Ex. 5 at 66, 68 to Second Myers Decl., ECF No. 109-1.

The Klinik has an obligation to conduct a reasonable investigation with the information available to it so that it can respond fully and completely.  The Court has reviewed the Klinik's amended responses to Interrogatory Nos. 2, 3, and 5 and its written clarification on Interrogatory No. 4.  Based on the record before the Court, the Court is satisfied that the Klinik conducted a reasonable investigation and its responses  to Interrogatory Nos. 2, 3, 4, and 5 cannot be said to non-responsive, incomplete, or evasive.  Therefore, Hazelden Betty Ford's motion to compel supplementation to Interrogatory Nos. 2, 3, 4, and 5 on the basis that the Klinik failed to conduct an adequate investigation is denied.

That being said, the Klinik is reminded of its continuing obligation under Federal Rule of Civil Procedure 26(e) to "supplement or correct" a response "in a timely manner if [it] learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the [Hazelden Betty Ford] during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1).  In particular, should additional information become known through the process of responding to Request for Production No. 18, the Klinik shall supplement its response to Interrogatory No. 2 accordingly.

---

obtain the information." (quoting *Continental Ill. Nat'l Bank & Trust Co.*, 136 F.R.D. at 684)).

### 2. Klinik Documents in Possession of Kampz

Hazelden Betty Ford moves to compel the Klinik "to collect, search, and produce any responsive corporate records being held by [the Klinik's] former [chief executive officer] and shareholder Klaus-Dirk Kampz." Pls.' Mem. in Supp. at 28. The Klinik maintains that Kampz is a third party, over whom it has no control, and it "does not have the legal right or practical ability to obtain documents from [him]." Def.'s Mem. in Opp'n at 20.

Under Rule 34, a responding party must produce those documents in its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). This concept of "possession, custody, or control" is not confined to physical possession, but also looks to "whether the party has a legal right to the documents or practical ability to obtain the information." *Triple Five of Minn., Inc. v. Simon*, 212 F.R.D 523, 527 (D. Minn. 2002) (citing *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000)).

> In assessing whether a party has the practical ability to obtain documents from a non-party, courts have focused on the "mutuality" of the responding party's relationship with the document owner, including whether the documents sought are considered records which the party is apt to request and obtain in the normal course of business, or whether the prior history of the case demonstrates cooperation by the non-party, including the production of documents and other assistance in conducting discovery, and the non-party has a financial interest in the outcome of the litigation.

*In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/HB), 2022 WL 972401, at *4 (D. Minn. Mar. 31, 2022) (citing *Afremov v. Sulloway & Hollis, P.L.L.C.*, No. 09-cv-03678 (PJS/JSM), 2011 WL 13199154, at *2 (D. Minn. Dec. 20, 2011)).

Hazelden Betty Ford is not seeking to compel Kampz's documents, but rather the *Klinik's* documents that may still be in Kampz's possession from when he was the chief executive officer of the Klinik. *See, e.g.*, Ex. 13 at 128 to Second Myers Decl., ECF No. 109-1 (Klinik's Rule 26(a)(1) disclosures identifying Kampz as "former CEO and shareholder" of the Klinik); Decl. of Daniel Fuchs ¶ 8 ("In May 2012 [Kampz] ceased to be a manager of [the Klinik].¨), ECF No. 137. When responding to interrogatories, the Klinik stated that it "believes [Kampz] had communications with [the] Betty Ford Center during the 2006-2012 time period." Ex. 5 at 67 to Second Myers Decl., ECF No. 109-1. The Klinik opened its treatment center in Germany in 2006 "using the trademark and domain name of 'My Way Betty Ford Klinik' and a therapy model licensed from a third-party controlled by [Kampz]." Def.'s Mem. in Opp'n at 4; *see, e.g.*, Ex. 5 at 70, 75 to Second Myers Decl.

The Klinik makes much of the fact that it was previously involved in litigation with Kampz and subsequently reached a settlement with him in 2013. *See, e.g.*, Fuchs Decl. ¶ 7. The Klinik contends that its relationship with Kampz "is not simply that of a former friendly employee." Def.'s Mem. in Opp'n at 21. Based on the record before the Court, however, the Klinik—through Helmut Heimfarth, *see infra* Section III.C.3.a.ii— approached Kampz in 2020, after this lawsuit was filed, seeking information in connection with this litigation. *See generally* Ex. 25 to Second Myers Decl. Kampz responded the same day, less than two hours later, and subsequently responded to a follow-up communication, providing information each time. *See generally* Ex. 25 to Second Myers Decl. Even assuming for sake of argument that the Klinik does not

45

somehow have the legal right to demand the return of its own corporate documents, *but see CA, Inc. v. AppDynamics, Inc.*, No. CV 13-2111 (WFK) (SIL), 2014 WL 12860591, at *3 (E.D. N.Y. Sept. 8, 2014) ("[W]here an individual creates documents in furtherance of his functions as a corporate officer, those documents are within the corporation's control for Rule 34 purposes and must be disclosed in response to a proper notice for production."), Kampz has previously cooperated with the Klinik regarding information related to this litigation. Moreover, "[i]n analyzing the practical ability of corporations to obtain work-related documents from former employees, courts [often] insist that corporations, at the very least, ask their former employees to cooperate before asserting they have no control over documents in the former employees' possession." *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 233 F.R.D. 338, 341 (S.D. N.Y. 2005).

Therefore, Hazelden Betty Ford's motion is granted in part to the extent that the Klinik shall formally ask Kampz whether he has any Klinik corporate documents in his possession responsive to Hazelden Betty Ford's requests for production. The Klinik shall then review any such documents and produce the responsive ones, if any, to Hazelden Betty Ford.

### 3. Depositions

Hazelden Betty Ford moves to compel the Klinik to produce certain individuals residing in Germany, including any corporate designee under Rule 30(b)(6), for deposition testimony here in Minneapolis, Minnesota, namely, Gawinski, the Klinik's

current chief executive officer; Marquardt, a general manager/director[11] of the Klinik;

Kampz, the Klinik's former chief executive officer and a former shareholder; and

Heimfarth, the Klinik's current outside auditor/independent accountant and tax advisor as

well as a current shareholder.[12]  As to Kampz and Heimfarth, the parties dispute whether

these men can be considered "managing agents" of the Klinik.  *See* Fed. R. Civ. P.

30(b)(6).  Then, as to the location of the depositions of the Klinik, Gawinski, Marquardt,

and any managing agents, the parties dispute whether such depositions should take place

in Germany (where the Klinik and these individuals are located) or in the United States.

### a. Managing Agents

As explained in *Gowan v. Mid Century Insurance Co.*,

> [i]f a corporation is a party to an action, an opposing party
> may name a particular corporate person to depose, but that
> person must be an "officer, director, or managing agent" of
> the corporate party in order to command that person's
> appearance via a notice of deposition served on the corporate
> party's attorney.  If the person selected for deposition is not
> an "officer, director, or managing agent," then the party
> seeking discovery must subpoena that deponent just as with
> any nonparty.

309 F.R.D. 503, 513 (D. S.D. 2015) (citations omitted); *accord Sherman*, 338 F.R.D. at

254; *see also, e.g.*, *Carlson Wagonlit Travel, Inc. v. Invensys PLC*, No. 01-cv-2337

(JRT/FLN), 2003 WL 21010961, at *2 (D. Minn. Mar. 8, 2003) ("Notice under Rule

---

[11] Marquardt was identified as a general manager in the Klinik's initial disclosures.  Ex. 13 at 127 to Second Myers Decl.  In an affidavit, he describes himself as an administrative director.  ECF No. 20 at 1.

[12] The Klinik asserts that deposition issues are premature because Hazelden Betty Ford has not yet served any deposition notices.  In light of the parties' positions with respect to these issues, the Court concludes that these questions are ripe for resolution and addressing them now is consistent with the spirt of Rule 1 of the Federal Rules of Civil Procedure and serves to advance this litigation forward.  *See* Fed. R. Civ. P. 1; *cf. Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 254 (D. Minn. 2021).

30(b)(1) of the Federal Rules of Civil Procedure is sufficient to depose a corporate

employee who is an officer, director, *managing agent*, or Rule 30(b)(6) designee.").

Courts consider a number of different factors in determining whether a particular

person is a managing agent:

> (1) Whether the person has discretion to exercise his judgment in matters pertaining to the entity;
>
> (2) Whether the person could be depended upon to show up and testify in response to the entity's request in response to the demand of the adverse party;
>
> (3) Whether the person is more likely to identify with the entity or the adverse party in the litigation; and
>
> (4) The extent to which the person has supervisory authority in areas pertinent to the litigation.

*Animal Legal Def. Fund v. Fur-Ever Wild*, No. 17-cv-4496 (JNE/HB), 2019 WL

13159451, at *4 (D. Minn. Feb. 20, 2019); *see also, e.g.*, *Atmosphere Hosp. Mgmt., LLC*

*v. Curtullo*, No. 5:13-CV-05040-KES, 2015 WL 136120, at *10, 13-14 (D. S.D. Jan. 9,

2015); *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 268 F.R.D. 45, 48-49 (E.D.

Va. 2010). "[T]he question of whether a particular person is a 'managing agent' is to be

answered pragmatically, on an ad hoc basis, considering the facts of the particular case."

*Calderon v. Experian Info. Sols., Inc.*, 287 F.R.D. 629, 632 (D. Idaho 2012), *aff'd*, 290

F.R.D. 508 (D. Idaho 2013); *accord Animal Legal Def. Fund*, 2019 WL 13159451, at *4;

*Atmosphere Hosp. Mgmt.*, 2015 WL 136120, at *14; *see also, e.g.*, *Rundquist v. Vapiano*

*SE*, 277 F.R.D. 205, 208 (D. D.C. 2011) ("Courts have liberally construed the term

managing agent, and the determination of whether an individual can be considered a

'managing agent' of an organization is fact intensive, decided largely on a case-by-case basis.").

"The determination of a deponent's status as a 'managing agent' is determined as of the time of the deposition, not as of the time when the activities disputed in litigation occurred." *Rundquist*, 277 F.R.D. at 208 (quotation omitted); *see Kolon Indus.*, 268 F.R.D. at 49*; see also, e.g.*, *Sherman*, 338 F.R.D. at 254; *Excel Fortress Ltd. v. Wilhelm*, No. CV-17-04297-PHX-DWL, 2019 WL 163252, at *7 (D. Ariz. Jan. 9, 2019); *E.E.O.C. v. Honda of Am. Mfg., Inc.*, No. 2:06-cv-0233, 2007 WL 682088, at *2 (S.D. Ohio Feb. 28, 2007).

"[T]he burden is on the party seeking the deposition to establish that the person sought to be deposed is a managing agent." *Animal Legal Def. Fund*, 2019 WL 13159451, at *4; *see also, e.g.*, *Sherman*, 338 F.R.D. at 254; *Calderon*, 287 F.R.D. at 632-33. That burden, however, "is a modest one." *Calderon*, 287 F.R.D. at 633; *accord Sherman*, 338 F.R.D. at 254; *Animal Legal Def. Fund*, 2019 WL 13159451, at *4; *Atmosphere Hosp. Mgmt.*, 2015 WL 136120, at *14. "[W]hen managing agency status is a close question, doubts should be resolved in favor of the examining party." *Kolon Indus.*, 268 F.R.D. at 49 (quotation omitted); *see Calderon*, 287 F.R.D. at 633 ("doubts should be resolved in favor of allow the deposition"); *see also, e.g.*, *Sherman*, 338 F.R.D. at 254; *Animal Legal Def. Fund*, 2019 WL 13159451, at *4; *Atmosphere Hosp. Mgmt.*, 2015 WL 136120, at *14.

The Court turns to whether Kampz and Heimfarth can be considered managing agents of the Klinik.

49

### i.  Kampz

As noted above, Kampz is the Klinik's former chief executive officer.  The Klinik
has submitted the declaration of its German counsel, who has "represented and advised
[the Klinik] since 2012."  Fuchs Decl. ¶ 6.  German counsel declares, under penalty of
perjury, that Kampz "ceased to be a manager" of the Klinik in May 2012, and "has not
been a shareholder of [the Klinik] or had any corporate or employment relationship with
the company" since 2013.  Fuchs Decl. ¶ 8.

"As a general rule, former employees cannot be 'managing agents' of an
organization and the organization cannot be compelled to produce them for deposition."
*Rundquist*, 277 F.R.D. at 208; *see also, e.g.*, *Sherman*, 338 F.R.D. at 254; *Excel Fortress
Ltd.*, 2019 WL 163252, at *7; *Kolon Indus.*, 268 F.R.D. at 49; *Honda of Am. Mfg.*, 2007
WL 682088, at *2.  Hazelden Betty Ford does not contend that Kampz is a current Klinik
employee.  Nor does it contend that Kampz's employment ceased as a result of this
litigation (indeed, Kampz's involvement with the Klinik ended nearly seven years before
this lawsuit began) or that the Klinik plans on rehiring Kampz in another position.  *Cf.
Rundquist*, 277 F.R.D. at 208 (exceptions made "when a corporation terminates an officer
in light of pending litigation" or "plans to rehire the individual in another position").

That leaves the question of whether Kampz "continues to act as a managing agent
[of the Klinik] despite no longer being an employee."  *Rundquist*, 277 F.R.D. at 208.
Hazelden Betty Ford asserts that "Kampz holds high[-]level positions in one or more
companies related to [the] Klinik."  Pls.' Mem. in Supp. at 33.  In support, Hazelden
Betty Ford cites generally to a screenshot from the My Way Psychiatrische Klinik

50

website, which identifies Kampz as its managing director and shareholder, and ten exhibits from its opposition to the Klinik's motion to dismiss for lack of personal jurisdiction. Hazelden Betty Ford has not articulated to the Court how these documents evidence a current connection between Kampz and the Klinik, let alone any sort of "sister company" or subsidiary relationship. *Contra Exim Brickell, LLC v. Bariven, S.A.*, No. 09-20915-CIV-GOLD/McALILEY, 2010 WL 11465462, at *2 (S.D. Fla. May 19, 2010) ("[I]t is undisputed that both Bariven and the two entities now employing Kabboul and Zavatti are subsidiaries of the same parent company."); *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2008 WL 4487679, at *3 (S.D. Fla. Sept. 29, 2008) ("At the very least, Mr. Burri's interests are still aligned with WABO's because he is now working for BASF Europe, a sister company to WABO that is also a subsidiary of BASF AG."). Hazelden Betty Ford is represented by counsel and the Court will neither guess nor make arguments for it.

That Kampz responded to an email from Heimfarth seeking information related to this litigation may suggest that Kampz is more likely to identify with the Klinik rather than Hazelden Betty Ford. But, on balance, the Court finds that Hazelden Betty Ford has not met its burden to show Kampz is presently a managing agent for the Klinik. Rather, Kampz is akin to a former executive and falls under the general rule that a corporation cannot be compelled to produce a former employee for a deposition. *In re Honda Am. Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. 535, 541-42 (D. Md. 1996) (former president); *see, e.g., Rundquist*, 277 F.R.D. at 209 (former president and former founder/vice president/director/officer); *Kolon Indus.*, 268 F.R.D. at 53 (former

manager); *cf. Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, No. 08
Civ. 04213 (WHP)(THK), 2009 WL 1447504, at *1 (S.D. N.Y. May 22, 2009).

Based on the foregoing, Hazelden Betty Ford's motion is denied as to compelling
the deposition of Kampz vis-à-vis the Klinik.  To be clear, however, the Court's ruling
does not preclude Hazelden Betty Ford from seeking deposition testimony from Kampz
through other means that might be available to it.

## ii.    Heimfarth

Heimfarth "is an outside auditor and tax advisor" to the Klinik.  Def.'s Mem. in
Opp'n at 34; *see also* Tr. 75:23-24 (describing Heimfarth as "an independent accountant"
and "tax adviser").[13]   The Klinik's German counsel has submitted a declaration, under
penalty of perjury, that Heimfarth "is not a manager, director or employee [of the
Klinik]."  Fuchs Decl. ¶ 9.  At the hearing, the Court inquired as to what extent, if any,
Heimfarth has the authority to act on behalf of the Klinik.  Tr. 77:13-15.  The Klinik
responded, "None."  Tr. 77:13-16.  The Klinik reached out to Heimfarth to see if he
would be willing to be deposed in this matter and he has refused.  *See generally* Ex. A to
Second Anderson Decl., ECF No. 140-1.

Heimfarth is also a shareholder of the Klinik.  *See, e.g.*, Ex. 13 at 128 to Second
Myers Decl.; Fuchs Decl. ¶ 9; Tr. 75:2-18, 76:8-10.  At the hearing, the Court inquired as
to whether he was a majority shareholder.  *See* Tr. 76:22-77:12.  While the Klinik's
counsel was not certain as to the percentage of shares held by Heimfarth, counsel was

---

[13] In its Rule 26(a)(1) disclosures, the Klinik included Heimfarth in the category of "current or former employees of
[the Klinik]," who could only be contacted through counsel.  Ex. 13 at 127 to Second Myers Decl.  At the hearing,
the Klinik clarified that Heimfarth should not have been listed as a current or former employee.  Tr. 74:24-75:18.

"relatively confident" it was less than five percent and described Heimfarth as a "minor shareholder." Tr. 76:22-78:3; *see also* Tr. 77:23-24 ("very minor shareholder").

Hazelden Betty Ford asserts that the Klinik has "produced multiple Heimfarth emails that specifically discuss 'Betty Ford Center USA' and demonstrate his involvement on behalf of [the Klinik] that are directly relevant to the issues in this case and evidence [of the Klinik's] awareness of the conflict with Hazelden Betty Ford." Pls.' Mem. in Supp. at 32. Hazelden Betty Ford points out that Heimfarth "had discussions with Kampz during this lawsuit to try to uncover information to help [the Klinik's] defense" and the fact that Heimfarth may only be contacted through the Klinik's counsel "further demonstrat[es] his alignment with [the Klinik]." Pls.' Mem. in Supp. at 32.

The Court has carefully reviewed the e-mail communications. The bulk of the communications are from 2013 and 2014. One of them appears to be a general shareholder communication, of which Heimfarth is just one of several recipients. *See generally* Ex. 27 to Second Myers Decl., ECF No. 113. The others, however, contain communications between Heimfarth and Kampz, which the Court agrees show Heimfarth's involvement in negotiations on behalf of the Klinik with Kampz. *See generally* Exs. 26, 28, 29 to Second Myers Decl., ECF Nos. 112, 114, 115. While the Klinik maintains that the 2014 communications show Heimfarth acting in his capacity as a tax advisor in connection with respect to the purchase of trademarks by the Klinik from Kampz, the Court views these communications as going beyond any tax implications from the transaction. Rather, Heimfarth is speaking on the Klinik's behalf with respect to the transaction.

Although an individual's status as a managing agent is determined at the time of the deposition, the Court finds Heimfarth's earlier conduct useful in considering his current status. More recently, Heimfarth reached out to Kampz again—this time seeking information related to this litigation and the Klinik's defense. *See generally* Ex. 25 to Second Myers Decl. After receiving Kampz's response, Heimfarth subsequently followed up with him with information from Klinik records, asking if this was the information to which Kampz was referring. Outside accountants and tax advisors do not typically get involved with litigation activities unrelated to the scope of their services. *See Atmosphere Hosp. Mgmt.*, 2015 WL 136120, at *15 ("It also ignores the reality of other facts herein: 'independent contractors' do not typically sign checks on the operating account of their principals, nor do they typically take part in meetings with accountants to go over the financial details of their principals, or enter into contracts with vendors on behalf of their principals." (citations omitted)).

Although a close question, "in view of the principal that doubts should be resolved in favor of the party seeking the deposition," the Court finds that Heimfarth is, for purposes of this motion, "a managing agent of [the Klinik] at least in some areas that are pertinent to the litigation." *Animal Legal Def. Fund*, 2019 WL 13159451, at *4. While Heimfarth may not be vested with a specific title at the Klinik, the evidence before the Court is that he "is involved in the [Klinik's] business much more directly" than as an outside accountant and tax advisor and minority shareholder. *Id.* Based on the foregoing, Hazelden Betty Ford's motion is granted as to compelling the deposition of Heimfarth vis-à-vis the Klinik.

The Court emphasizes that the finding of Heimfarth as a managing agent of the Klinik for purposes of this motion is limited, namely, "that in so finding, [the Court] concludes only that [Heimfarth's] deposition may be noticed through counsel for [the Klinik] and that [the Klinik] shall be responsible for securing his appearance." *Id.* "The Court need not and does not determine at this point to what extent or in what areas [Heimfarth's] testimony may, or may not, be binding on . . . [the Klinik]." *Id.* "That determination must wait until after the relationship is fully explored on the record at the deposition and at such time as specific testimony is sought to be introduced." *Id.*; *see Calderon*, 287 F.R.D. at 633.

### b. Location of the Depositions of the Klinik & its Officers, Directors, and Managing Agents

"Notice under Rule 30(b)(1) of the Federal Rules of Civil Procedure is sufficient to depose a corporate employee who is an officer, director, managing agent, or Rule 30(b)(6) designee." *Carlson Wagonlit Travel*, 2003 WL 21010961, at *2 (emphasis omitted). The question now becomes where the depositions of the Klinik (the defendant corporation), Gawinski (its chief executive officer), Marquardt (its general manager/director), and Heimfarth (a managing agent for purposes of the instant motion) should take place.

"The general rule is that the deposition of a corporation should occur at the corporation's place of business." *Willis Electric Co., Ltd. v. Polygroup Macau Ltd.*, No. 15-cv-3443 (WMW/KMM), 2020 WL 3397359, at *2 (D. Minn. June 19, 2020); *see also, e.g.*, *Pinnacle Pkg. Co., Inc. v. Constantia Flexibles GmbH*, No. 12-cv-537-JED-TLW,

2015 WL 9216845, at *5, 7 (N.D. Okla. Dec. 17, 2015); *Rundquist*, 277 F.R.D. at 212.

"Similarly, ordinary employees are subject to the general rule that a deponent should be deposed near his or her residence, or principal place of work." *Willis Electric Co.*, 2020 WL 3397359, at *2 (quotation omitted); *see also, e.g.*, *Carlson Wagonlit Travel*, 2003 WL 21010961, at *2; *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*, 187 F.R.D. 578, 587 (D. Minn. 1999). "When a foreign defendant is involved, this presumption may be even stronger." *S.E.C. v. Banc de Binary*, No. 2:13-CV-993-RCJ-VCF, 2014 WL 1030862, at *3 (D. Nev. Mar. 14, 2014); *see Aérospatiale*, 482 U.S. at 546 ("American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.").

"When location is disputed, courts generally consider a variety of factors in determining whether the deposition of a foreign corporation should occur in the United States or abroad." *In re Vitamin Antitrust Litig.*, Misc. No. 99-197 TFH, MDL No. 1285, 2001 WL 35814436, at *4 (D. D.C. Sept. 11, 2001); *see also, e.g.*, *Pinnacle Pkg. Co.*, 2015 WL 9216845, at *7. These factors include:

> (1) the burden to the parties of holding the depositions in the United States relative to the burden of holding the depositions abroad, including the burdens imposed on the witnesses and the parties' counsel; (2) the court's ability to supervise depositions in the contested location; (3) whether depositions would be impeded by any legal or procedural barriers in another nation; and (4) the potential affront to the sovereignty of a foreign nation if a deposition pursuant to the Federal Rules of Civil Procedure is held within its borders.

*In re Vitamin Antitrust Litig.*, 2001 WL 35814436, at *4 (footnotes omitted); *see also,*

*e.g.*, *Pinnacle Packaging Co.*, 2015 WL 9216845, at *7 ("Factors considered by courts in conducting this analysis include: the location of counsel for the parties, the number of corporate representatives to be deposed, the likelihood of significant discovery disputes and the Court's ability to resolve those disputes, whether the persons to be deposed often travel for business purposes, a balancing of the equities, issues of comity/Federal Rule of Civil Procedure 28(b), and the relative costs of the depositions."); *cf. Willis Electric*, 2020 WL 3397359, at *3-4; *Azarax, Inc., v. Wireless Comm. Venture LLC*, No. 16-cv-3228 (JRT/LIB), 2018 WL 1773965, at *8-11 (D. Minn. Apr. 13, 2018). As summarized by one federal court:

> [D]etermining the location of the deposition of a corporate witness is a fact intensive inquiry that begins with the general rule that the deposition is to occur in the forum where the defendant has its principal place of business and ends with an analysis of a number of factors to determine whether the necessary facts exist to distinguish the case from the ordinary run of civil cases such that peculiar circumstances exist to compel the Court to suspend the general rule.

*Pinnacle Packaging Co.*, 2015 WL 9216845, at *7 (internal quotation marks omitted).

Ultimately, "[t]he Court has great discretion in designating the location of taking a deposition, taking into account the facts and equities of each case." *Azarax*, 2018 WL 1773965, at *8 (quotation omitted); *accord Willis Electric Co.*, 2020 WL 3397359, at *2; *see also, e.g.*, *Archer Daniels Midland Co.*, 187 F.R.D. at 588 ("In the final analysis, our selection of the forum for a plaintiff's deposition should not be rigidly formulaic for, in the interests of justice, we have great discretion in designating the location of taking a deposition, and that discretion must be directed toward considering each case on its own

57

facts and the equities of a particular situation." (quotation and citation omitted)).

Here, the Court focuses on the relative burdens to the parties, considerations of comity, and matters of case management.

### i.    Relative Burdens

Hazelden Betty Ford's counsel is located in the United States, in Minnesota.  The Klinik's counsel is located both in the United States, in Minnesota and in Illinois, and in Germany.

There is no dispute that Gawinski, Marquardt, and Heimfarth are located in Germany.  There is also no dispute, for purposes of the present motion, that these individuals do not regularly travel to the United States and, specifically, Minnesota.[14] *See Azarax*, 2018 WL 1773965, at *11; *Pinnacle Pkg. Co.*, 2015 WL 9216845, at *8; *In re Honda Am. Motor Co.*, 168 F.R.D. at 539.  Gawinski and Marquardt last visited the United States approximately nine years ago and Heimfarth last visited approximately two years ago; none of them have current plans to return.  Fuchs Decl. ¶ 12.  It is not a logical leap to infer that the Klinik may designate one of these individuals as its corporate designee.  Depositions of Gawinski and Marquardt will also result in "indirect costs" to the Klinik "associated with at least two key officers being out of the country for unplanned travel to the United States."  Def.'s Mem. in Opp'n at 38; *cf. Hazelden I*, 504 F. Supp. 3d at 977 ("The Court recognizes that [the] Klinik is a small organization and the challenges associated with litigating in a foreign country are significant.").

---

[14] The Court is sensitive to the fact that the Klinik disputed and continues to dispute the existence of personal jurisdiction.  *See, e.g.*, Defs.' Mem. in Opp'n at 1; *Hazelden I*, 504 F. Supp. 3d at 974-78 (analyzing personal jurisdiction).

At minimum, depositions in the United States would require at least four individuals (Gawinski, Marquardt, the Klinik's German counsel, and Heimfarth) to travel to the United States compared to at least two attorneys (one for Hazelden Betty Ford and one for the Klinik) that would be required to travel to Germany if the depositions were held in Germany. On balance, consideration of the respective burdens favors holding the depositions in Germany. *See Pinnacle*, 2015 WL 9216845, at *7-8; *see also Aérospatiale*, 482 U.S. at 546.

### ii.    Considerations of Comity

"When depositions for cases filed in the United States are held in foreign countries, the parties must be sure to comply with the requirements of those countries or risk offending the sovereignty of those nations." *Pinnacle Pkg. Co.*, 2015 WL 9216845, at *10. "If foreign sovereignty is in fact implicated in a given case, comity analysis requires the balancing of competing interests between the sovereigns and the parties involved." *In re Honda Am. Motor Co.*, 168 F.R.D. at 537. "[I]f a federal court compels discovery on foreign soil, foreign judicial sovereignty may be infringed, but when depositions of foreign nationals are taken on American or neutral soil, courts have concluded that comity concerns are not implicated." *Id.* at 538 (citing cases); *see also*, *e.g.*, *Schindler Elevator Corp. v. Otis Elevator Corp.*, 657 F. Supp. 2d 525, 530 (D. N.J. Sept. 24, 2009). "There is no affront to [German] sovereignty by virtue of a deposition in [Minnesota] or at some convenient location outside of [Germany]." *Schindler Elevator Corp.*, 657 F. Supp. 2d at 530; *see In re Honda Am. Motor Co.*, 168 F.R.D. at 538.

Again, as the district court observed, "the United States has an interest in

adjudicating disputes related to trademarks, patents, and business interests of U.S.-based corporations." *Hazelden I*, 504 F. Supp. 3d at 977; *see also In re Honda Am. Motor Co.*, 168 F.R.D. at 539. And again, "[t]his is particularly true when a defendant argues—as [the] Klinik has here—that the plaintiff would be barred from seeking relief in the Courts were defendant is domiciled, thereby suggesting that there is no other forum in which Plaintiffs can adjudicate their grievances." *Hazelden I*, 504 F. Supp. 3d at 977-78.

Accordingly, considerations related to comity favor taking the depositions in the United States or another neutral location.

### iii.    Matters of Case Management

In the Court's view, matters of case management weigh decidedly in favor of conducting the depositions in Minnesota, the forum for this litigation. Even assuming for sake of argument that "U.S.-style" depositions are available at the United States embassy and consulate in Frankfurt, Germany, and that the consular costs associated with such depositions are proportional to the needs of this case, the depositions could still only be conducted through that process if "a witness is willing to testify voluntarily." Ex. 30 at 261 to Second Myers Decl. ("Judicial Assistance" information from the U.S. Embassy & Consulates in Germany website, *available at* https://de.usembassy.gov/judicial-assistance/), ECF No. 109-1. "All testimony must be given voluntarily without coercion or threat of future sanctions. Therefore, prior to the taking of testimony and in accordance with German law, the consular officer will administer a voluntariness advisement to each witness." Ex. 30 at 261 to Second Myers Decl.

Before the Court will require Hazelden Betty Ford to pursue depositions in

Germany, "it must be convinced that doing so will likely prove fruitful." *Pinnacle Pkg. Co.*, 2015 WL 9216845, at *10; *cf. In re Vitamin Antitrust Litig.*, 2001 WL 35814436, at *7-9. The record before the Court overwhelmingly suggests otherwise. Gawinski, Marquardt, and Heimfarth have all indicated that they do not intend to appear voluntarily. *See, e.g.*, Def.'s Mem. in Opp'n at 41 ("[The Klinik] has endeavored, thus far without success, to obtain agreement of individual witnesses to appear in Frankfurt or elsewhere."), 41-42 ("[The Klinik] asked Messrs. Gawinski and Marquardt to appear for videotaped depositions. Unfortunately, they each have presently declined and asserted their constitutional rights as German citizens to only be questioned before a German judge."); Ex. A at 3 to Second Anderson Decl. (letter from Heimfarth refusing deposition). The Court acknowledges and appreciates their refusal appears to be based on genuinely held beliefs regarding German privacy laws and concerns over anticipated lines of questioning.[15] As evidenced in the Court's discussion above and reflected in the ample briefing related to these two motions, the fact the parties are engaged in addiction treatment services has interjected a host of issues related to patient confidentiality and the safeguarding of deeply private medical information into this litigation. All of this is to say that, unlike certain deponents in *Pinnacle Packaging Co.*, the Court is not convinced that Hazelden Betty Ford will be able to obtain depositions of the Klinik, Gawinski,

---

[15] In a similar vein, because corporations must speak through their designees, it would not be much of stretch to think that such concerns might also be shared by any of the Klinik's 30(b)(6) designees. *Cf. In re Vitamin Antitrust Litig.*, 2001 WL 35814436, at *9 (noting that "[e]ven though counsel suggested at the hearing that Federal Rules depositions would proceed without incident in Germany because foreign defendants are subject to the Court's sanction powers and would be unlikely to raise legal or procedural bars to depositions" it was "not altogether unlikely that a number of the foreign defendants' officers, directors, and managing agents will hire their own counsel who, on behalf of their clients, may wish to avail themselves of all available legal and procedural protections").

Marquardt, and Heimfarth in Germany. *Contra* 2015 WL 9216845, at \*10.

The record foretells that issues are going to arise during these depositions.[16]  *See Kolon Indus.*, 268 F.R.D. at 55.  At least one court has qualified considerations related to the parties' conduct in discovery by distinguishing between "a party's good faith assertion of reasonable objections, which is entirely appropriate discovery conduct, and a party's uncooperative or obstructionist discovery behavior and the assertion of meritless or near-frivolous objections."  *In re Outsidewall Tire Litig.*, 267 F.R.D. 466, 474 (E.D. Va. 2010) (footnote omitted).   The "likelihood of good faith objections militate in favor of holding depositions abroad and the likelihood of bad faith objections militate in favor of holding depositions at home."  *Banc de Binary*, 2014 WL 1030862, at \*6; *see In re Outsidewall Tire Litig.*, 267 F.R.D. at 474.  The Klinik advocates for such an approach here, maintaining that it "has not asserted any meritless objections" and "has negotiated in good faith."  Def.'s Mem. in Opp'n at 39.

*Banc de Binary* "respectfully disagree[d]" with a "distinction between 'good faith' and 'obstructionist' objections."  2014 WL 1030862, at \*6.  *Banc de Binary* explained that, "[p]resumably, this distinction is predicated on the fact that the rules were designed to be self-executing and the assumption that attorneys operating in good faith will be self-policing and not require judicial intervention."  *Id.*  *Banc de Binary* went on to point out

---

[16] To this end, the parties are reminded of Federal Rule of Civil Procedure 30(c)(2), which states:

> An objection at the time of the examination--whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition--must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. . . . A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

that "courts must decide all discovery disputes, whether they are brought in good faith or bad faith" and "the likelihood of good faith disputes . . . [could] militate in favor of holding depositions at home." *Id.*; *cf. Kolon Indus.*, 268 F.R.D. at 55 ("Moreover, the record foretells that privilege issues are going to arise during the depositions.  It is thus important that the court be available to resolve disputes to assure the rights of the parties and the deponents are protected while assuring that legitimately posed questions seeking non-privileged information are answered.").  This Court agrees with *Banc de Binary*.

The Court finds that matters of case management weigh heavily in favor of conducting the depositions of the Klinik, Gawinski, Marquardt, and Heimfarth in the United States, in Minnesota.

> iv.    **Depositions of the Klinik, Gawinski, Marquardt, and Heimfarth shall take place in Minneapolis, Minnesota, absent agreement by the parties to take these depositions at a mutually agreeable alternative location or by stipulation to an alternative procedure afforded by the Federal Rules of Civil Procedure**

Having taken into account the respective burdens to the parties, considerations of comity, and matters related to case management, and faced with the unlikelihood of successful depositions in Germany coupled with the near certain likelihood of future disputes between the parties regarding the scope of these depositions, the Court concludes in the final analysis that the circumstances warrant departure from the general rule that the Klinik, Gawinski, Marquardt, and Heimfarth's depositions be conducted in Germany.  Accordingly, Hazelden Betty Ford's motion is granted in part that, absent agreement by the parties to take these depositions at a mutually agreeable alternative

location[17] or by stipulation to an alternative procedure afforded by the Federal Rules of Civil Procedure, the depositions of the Klinik, Gawinski, Marquardt, and Heimfarth shall take place in Minneapolis, Minnesota.

The Court's ruling should not foreclose continued discussions among the parties as to the possibility of another mutually agreeable location outside of the United States or to an alternative procedure afforded by the Federal Rules of Civil Procedure.  At the hearing, the Court inquired as to the possibility of other mutually agreeable locations or using videoconferencing.  *See* Tr. 46:7-47:25, 59:23-63:14.  There appears to be room for continued discussion and the Court strongly encourages the parties to carry on those discussions in good faith in light of the efficiencies and cost savings to be gained.

As stated above, absent an agreement by the parties to take these depositions at a mutually agreeable alternative location or by stipulation to an alternative procedure afforded by the Federal Rules of Civil Procedure, the depositions of the Klinik, Gawinski, Marquardt, and Heimfarth shall take place in Minneapolis, Minnesota.  Hazelden Betty Ford previously offered to pay for the Klinik's German witnesses to fly to Amsterdam to take "U.S.-style" depositions.  Tr. 47:6-15; Pls.' Mem. in Supp. at 11 ("Hazelden Betty Ford again repeated its request to take depositions in Amsterdam and offered to pay reasonable travel expenses for [the Klinik's] witnesses.");  Ex. 21 at 240 to Second Myers Decl. (offering to pay "reasonable travel expenses" to depose Klinik witnesses in Amsterdam), ECF No. 109-1.  To strike a balance with the burden to the Klinik,

---

[17] "[T]he parties are reminded that the depositions will proceed—no matter which location is chosen—as they would at trial." *Banc de Binary*, 2014 WL 1030862, at *11; *see* Fed. R. Civ. P. 30(c)(1) ("examination and cross-examination of a deponent proceed as they would at trial").

64

Gawinski, Marquardt, and Heimfarth associated within having their depositions take place in Minneapolis, Minnesota, and in light of this prior offer, Hazelden Betty Ford shall bear the costs of deposing the Klinik, Gawinski, Marquardt, and Heimfarth in the event those depositions ultimately take place in Minnesota, limited to general deposition costs and reasonably priced travel to, from, and within Minnesota as well as meal and accommodation costs[18] incurred by the Klinik, Gawinski, Marquardt, and Heimfarth. *See Azarax*, 2018 WL 1773965, at *12; *Banc de Binary*, 2014 WL 1030862, at *10-11; *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 630 (C.D. Cal. 2005); *see also Aérospatiale*, 482 U.S. at 546 ("Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper use of discovery requests."). Such reasonable travel, meal, and accommodation costs shall be reimbursed by Hazelden Betty Ford within 15 days after receipt of a statement of costs with accompanying receipts. The Klinik, Gawinski, Marquardt, and Heimfarth shall bear their own legal expenses related to the depositions.

## IV. ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Klinik's Motion to Compel, ECF No. 100, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

2. Hazelden Betty Ford's Motion to Compel Further Answers, Production of Documents, and Deposition Appearances in the United States, ECF No. 106, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

---

[18] *See Azarax*, 2018 WL 1773965, at *12 n.10 ("[T]his includes only reasonably priced, coach-class airfare travel to [Minnesota], travel within [Minnesota] as required to attend the deposition, and reasonably priced accommodations as needed to attend the deposition[s] ordered herein.").

3. Each party shall bear its own costs and attorney fees in connection with these motions. *See* Fed. R. Civ. P. 37(a)(5)(C).

4. **Within 14 days from the date of this Order**, the parties shall have met and conferred and filed a joint letter on the docket, specifying which if any portions of this Order should remain sealed and the basis therefor.

5. All prior consistent orders remain in full force and effect.

6. Failure to comply with any provision of this Order or any other prior consistent Order shall subject the non-complying party, non-complying counsel and/or the party such counsel represents to any and all appropriate remedies, sanctions and the like, including without limitation: assessment of costs, fines and attorneys' fees and disbursements; waiver of rights to object; exclusion or limitation of witnesses, testimony, exhibits and other evidence; striking of pleadings; complete or partial dismissal with prejudice; entry of whole or partial default judgment; and/or any other relief that this Court may from time to time deem appropriate.


Dated: March___29___, 2023                    _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              District of Minnesota


                                              *Hazelden Betty Ford Foundation et al. v.*
                                              *My Way Betty Ford Klinik GmbH*
                                              Case No. 20-cv-409 (JRT/TNL)

66